SUPREME COURT. Tioga General Term, May, 1857. *Gray, Mason,* and *Balcom,* Justices.

## THE PEOPLE *v.* EDWARD H. RULLOFF.

Direct evidence is not, in all cases, indispensable for the purpose of proving the *corpus delicti*, on a trial for murder. BALCOM, J., dissenting.

The *dictun* of Lord Hale, in 2 *Hale P. C.*, 290, in which a contrary opinion is expressed, discussed and disapproved.

Where, on a trial for murder, there is no direct evidence of the *corpus delicti*, and it is evident that none can be adduced, the *corpus delicti* may be proved by circumstantial evidence, when it is so strong and intense as to produce the full certainty of death; but the death can be inferred, in such case, only from such strong and unequivocal circumstances as render it morally certain, and leave no ground for reasonable doubt. BALCOM, J., dissenting.

The cases bearing on this point reviewed, and the rules and principles of circumstantial evidence discussed.

On the trial of an indictment for murder, the law, in its clemency, presumes the entire innocence of the prisoner; and the government, before it has a right to ask for a conviction, is bound, not only to prove the alleged murder, but is required also to establish by evidence the guilt of the prisoner beyond a reasonable doubt. *Per* MASON, J.

The *corpus delicti* is made up of two things: First. The fact that a human being has been killed; and Secondly. The existence of criminal and human agency as to the cause of the death. *Per* MASON, J.

In proving the confessions of a prisoner, it is required that all the confessions be taken together, as well that which makes for the prisoner as that which makes against him; but it is not necessary to adopt the whole confession, where other evidence in the case proves part of the confession to be untrue. *Per* MASON, J.

Confessions of a prisoner are a doubtful species of evidence, and should be received with great caution. *Per* MASON, J.

No man can be convicted of a criminal offence upon his own confession alone that a crime has been committed; confessions are competent evidence in the case, but alone are not sufficient. *Per* MASON, J.

Charge of Judge Mason, on the trial at the circuit, of an indictment for murder.

Form of an indictment for the murder of an infant child, whose name and the manner of whose death were unknown, with counts in various forms to meet the circumstantial evidence on which the prosecution relied to prove the *corpus delicti*.

Where an impartial jury cannot be obtained in the county in which the indictment is found, the place of trial can be changed only by removing the indictment into the Supreme Court by *certiorari*, and then moving the Supreme Court to change the place of trial to some other county.

Form of a writ of *certiorari* to remove an indictment before trial from the Oyer and Terminer to the Supreme Court.

Where an indictment has been removed into the Supreme Court by *certiorari*, before trial, it must be tried at a Circuit Court, like other issues pending in the Supreme Court, and not at the Oyer and Terminer.

THE prisoner was indicted in the county of Tompkins, for the murder of his infant daughter. The indictment was in the following form:

At a Court of Sessions, holden at the court-house in the town of Ithaca, in and for the county of Tompkins, on the second day of June, in the year one thousand eight hundred and fifty-six, before Honorable Samuel P. Wisner, county judge, and Clinton Bowker and William B. Speed, justices of the peace and members of said court, in and for the county of Tompkins:

The jurors of the people of the State of New-York, in and for the body of the county of Tompkins, to wit, &c., good and lawful men of said county, then and there being duly sworn and charged to inquire for the people of the State of New-York, and for the body of the county aforesaid, upon their oaths present: That Edward H. Rulloff, late of the town of Lansing, in said county of Tompkins, heretofore, to wit, on the twenty-third day of June, in the year of our Lord one thousand eight hundred and forty-five, at the town of Lansing in the county aforesaid, with force and arms, in and upon one —— Rulloff, the infant daughter of said Edward H. Rulloff, whose christian name is to the jurors unknown, in the peace of God and the people of the State of New-York then and there being, feloniously, willfully, and of his malice aforethought, did make an assault; and that the said Edward H. Rulloff, with a certain knife of the value of six cents, which he, the said Edward H. Rulloff, in his right hand then and there had and held, the said —— Rulloff, infant daughter of said Edward H. Rulloff, in and upon the left side, between the short ribs of

her, the said —— Rulloff, infant daughter of said Edward
H. Rulloff, then and there feloniously, willfully, and of his
malice aforethought, did strike and thrust, giving to the said
—— Rulloff, infant daughter of said Edward H. Rulloff,
then and there with the knife aforesaid, in and upon the
said left side, between the short ribs of her, the said ——
Rulloff, infant daughter of said Edward H. Rulloff, one
mortal wound of the breadth of three inches, and of the
depth of six inches; of which said mortal wound the said
—— Rulloff, infant daughter of said Edward H. Rulloff,
from the said twenty-third day of June in the year afore-
said, until the twenty-fourth day of the same month, in the
year aforesaid, did languish and languishing did live; on
which said twenty-fourth day of June, in the year aforesaid,
at the town aforesaid, in the county aforesaid, of the said
mortal wound, said —— Rulloff, infant daughter of said
Edward H. Rulloff, died, and so the jurors aforesaid, upon
their oath aforesaid, do say, that the said Edward H. Rul-
loff, the said —— Rulloff, infant daughter of said Edward
H. Rulloff, in manner and form aforesaid, feloniously, will-
fully, and of his malice aforethought, did kill and murder,
against the peace of the people of the State of New-York,
and their dignity.

And the jurors aforesaid, upon their oaths aforesaid, do
further present: That Edward H. Rulloff, late of the town
of Lansing, in said county of Tompkins heretofore, to wit,
on the twenty-fourth day of June, in the year of our Lord
one thousand eight hundred and forty-five, with force and
arms, at the town of Lansing in the county aforesaid, in
and upon one —— Rulloff, the infant daughter of said
Edward H. Rulloff, whose christian name is to the jurors
unknown, in the peace of God and of the people of
the State of New-York then and there being, feloniously,
willfully, and of his malice aforethought, did make an
assault; and that the said Edward H. Rulloff, with both
his hands and feet, the said —— Rulloff, infant daughter

of said Edward H. Rulloff, to and against the ground, then
and there feloniously, willfully, and of his malice afore-
thought, did cast and throw; and that the said Edward H.
Rulloff, with both the hands and feet of him, the said
Edward H. Rulloff, then and there, and whilst the said
—— Rulloff, infant daughter of said Edward H. Rulloff,
was so lying upon the ground, the said —— Rulloff, infant
daughter of said Edward H. Rulloff, in and upon the head,
stomach, back and sides of her, the said —— Rulloff, infant
daughter of said Edward H. Rulloff, then and there, feloni-
ously, willfully, and of his malice aforethought, did strike,
beat and kick, giving to the said —— Rulloff, infant
daughter of said Edward H. Rulloff, then and there, as
well by the casting and throwing of her, the said ——
Rulloff, infant daughter of said Edward H. Rulloff, to the
ground as aforesaid, as also by striking, beating and kicking
the said —— Rulloff, infant daughter of said Edward H.
Rulloff, in and upon the head, stomach, back and sides of
her, the said —— Rulloff, infant daughter of said Edward
H. Rulloff, with both the hands and feet of him, the said
Edward H. Rulloff, in manner aforesaid, several mortal
bruises, in and upon the head, stomach, back and sides of
her, the said —— Rulloff, infant daughter of said Edward
H. Rulloff, of which said several mortal bruises she, the
said —— Rulloff, infant daughter of the said Edward H.
Rulloff, then and there instantly died; and so the jurors
aforesaid, upon their oath aforesaid, do say, that the said
Edward H. Rulloff, in manner and form aforesaid, feloni-
ously, willfully, and of his malice aforethought, did kill
and murder against the peace of the people of the State of
New-York and their dignity.

And the jurors aforesaid, upon their oaths aforesaid, do
further present: That Edward H. Rulloff, late of the town
of Lansing, in said county of Tompkins, heretofore, to wit,
on the twenty-fourth day of June, in the year of our Lord
one thousand eight hundred and forty-five, with force and

arms, at the town of Lansing in the county aforesaid, in and upon —— Rulloff, the infant daughter of said Edward H. Rulloff, whose christian name is to the jurors unknown, in the peace of God and of the people of the State of New-York then and there being, feloniously, willfully and of his malice aforethought, did make an assault; and that the said Edward H. Rulloff, a certain silk handkerchief, of the value of one dollar, about the neck of her, the said —— Rulloff, infant daughter of said Edward H. Rulloff, then and there, feloniously, willfully and of his malice aforethought, did fix, tie and fasten; and that the said Edward H. Rulloff, with the silk handkerchief aforesaid, her, the said —— Rulloff, infant daughter of said Edward H. Rulloff, then and there, feloniously, willfully and of his malice aforethought, did choke, suffocate and strangle; of which said choking, suffocation and strangling, she, the said —— Rulloff, infant daughter of said Edward H. Rulloff, then and there instantly died; and so the jurors aforesaid, upon their oath aforesaid, do say, that the said Edward H. Rulloff, the said —— Rulloff, infant daughter of said Edward H. Rulloff, in manner and form aforesaid, feloniously, willfully and of his malice aforethought, did kill and murder, against the peace of the people of the State of New-York and their dignity.

And the jurors aforesaid, upon their oath aforesaid, do further present: That Edward H. Rulloff, late of the town of Lansing, in the county of Tompkins, laborer, not having the fear of God before his eyes, but being moved and seduced by the instigation of the Devil, and of his malice aforethought, wickedly contriving and intending one —— Rulloff, the infant daughter of said Edward H. Rulloff, whose christian name is to the jurors unknown, with poison, willfully, feloniously, and of his malice aforethought, to kill and murder, on the twenty-third day of June, in the year of our Lord one thousand eight hundred and forty-five, with force and arms, at the town aforesaid, in the county aforesaid, feloniously, willfully and of his malice aforethought, a large quan-

tity of a certain deadly poison called arsenic, to wit, the quantity of two drachms of the said arsenic did put, mix, and mingle into and with a certain quantity of milk, which the said —— Rulloff, infant daughter of said Edward H. Rulloff, was then and there about to drink (the said Edward H. Rulloff then and there well knowing that the said —— Rulloff, infant daughter of said Edward H. Rulloff, intended and was then about to drink the said milk, and the said Edward H. Rulloff then and there also well knowing the said arsenic, so as aforesaid by him put, mixed and mingled into and with the said milk, to be a deadly poison); and the said —— Rulloff, infant daughter of said Edward H. Rulloff, afterwards, to wit, on the day and year aforesaid, at the town aforesaid, in the county aforesaid, did take, drink and swallow down a large quantity, to wit, half a pint of the said milk with which the said arsenic was so mixed and mingled by the said Edward H. Rulloff, as aforesaid (she, the said —— Rulloff, infant daughter of said Edward H. Rulloff, at the time she so took, drank and swallowed down the said milk, not knowing there was any arsenic, or any other poisonous or hurtful ingredient mixed or mingled with the said drink), by means whereof she, the said —— Rulloff, infant daughter of said Edward H. Rulloff, then and there became sick and greatly distempered in her body; and the said —— Rulloff, infant daughter of said Edward H. Rulloff, of the poison aforesaid, so by her taken, drank and swallowed down as aforesaid, and of the sickness occasioned thereby, from the said twenty-third day of June in the year last aforesaid, until the twenty-fourth day of the same month in the same year, at the town aforesaid, in the county aforesaid, did languish, and languishing did live; on which said twenty-fourth day of June, in the year aforesaid, at the town aforesaid, in the county aforesaid, the said —— Rulloff, infant daughter of said Edward H. Rulloff, of the said poison died; and so the jurors aforesaid, upon their oaths aforesaid, do say, that the said Edward H. Rulloff, the said —— Rulloff,

infant daughter of said Edward H. Rulloff, in manner and form aforesaid, feloniously, willfully and of his malice aforethought, did kill and murder, against the peace of the people of the State of New-York, and their dignity.

And the jurors aforesaid, upon their oath aforesaid, do further present: That Edward H. Rulloff, late of the town of Lansing, in the county of Tompkins, laborer, not having the fear of God before his eyes, but being moved and seduced. by the instigation of the devil, on the twenty-third day of June, in the year of our Lord one thousand eight hundred and forty-five, with force and arms, at the town aforesaid, in the county aforesaid, in and upon one —— Rulloff, infant daughter of said Edward H. Rulloff, whose christian name is to the jurors unknown, in the peace of God and of the people of the State of New-York then and there being, feloniously, willfully and of his malice aforethought, did make an assault; and that the said Edward H. Rulloff, with a certain weapon, to the jurors aforesaid unknown, of the value of six cents, which he, the said Edward H. Rulloff, in his right hand then and there had and held, the said —— Rulloff, infant daughter of said Edward H. Rulloff, in and upon the left side of the head, then and there, feloniously, willfully and of his malice aforethought, did strike and thrust, giving to the said —— Rulloff, infant daughter of said Edward H. Rulloff, then and there, with the weapon aforesaid, in and upon the said left side of the head, one mortal wound, of which said mortal wound the said —— Rulloff, infant daughter of said Edward H. Rulloff, from the said twenty-third day of June in the year aforesaid, until the twenty-fourth day of the same month, in the year aforesaid, at the town aforesaid, in the county aforesaid, did languish, and languishining did live; on which said twenty-fourth day of June, in the year aforesaid, the said —— Rulloff, infant daughter of said Edward H. Rulloff, at the town aforesaid, in the county aforesaid, of the said mortal wound died; and so the jurors aforesaid, upon their oath aforesaid, do say,

that the said Edward H. Rulloff, the said —— Rulloff, the infant daughter of said Edward H. Rulloff, whose christian name is to the jurors unknown, in manner and form aforesaid, feloniously, willfully and of his malice aforethought, did kill and murder, against the peace of the people of the State of New-York, and their dignity. .

J. A. WILLIAMS, <em>Dist. Att'y.</em>

To this indictment the prisoner pleaded not guilty. The counsel for the prisoner claiming that an impartial trial could not be had in the county of Tompkins, sued out a writ of *certiorari* in the following form :

The People of the state of New-York to our justice and judges assigned to hold our Court of Oyer and Terminer in and for our county of Tompkins, and to every one of them Greeting :

We being willing, for certain reasons, that all and singular the indictments, records and proceedings whereof Edward H. Rulloff stands indicted before you, be determined before our Supreme Court and not elsewhere, do command you and every one of you that you or one of you do send under your seals or under the seal of one of you, before our said Supreme Court forthwith, at Ithaca, in the county of Tompkins, all and singular the said indictments, records and proceedings, with all things touching the same by whatsoever name the said Edward H. Rulloff is called in the same, together with this writ, that we may further cause to be done therein what of right and according to law we shall see fit to be done.

Witness, William H. Shankland, Justice, at Ithaca, August [L. S.]    twenty-first, one thousand eight hundred and fifty-six.

. CHARLES G. DAY, <em>Clerk.</em>

Allowed, this 21st day of }
    August, 1856.      }

W. H. SHANKLAND, *Justice of the Supreme Court.*

*Boardman & Finch,* defendant's attorneys.

On application to the Supreme Court, it appearing that an impartial trial could not be obtained in the county of Tompkins, because of opinions already formed by the jurors upon the question of the prisoner's guilt, an order was made that the indictment be tried in the county of Tioga. The cause came on to trial at the Tioga Circuit, before the Hon. Charles Mason one of the justices of the Supreme Court, on the 28th day of October 1856.

The counsel for the prosecution in opening the cause to the court and jury stated in detail the facts and circumstances he expected to prove and should rely upon to establish the guilt of the defendant, and on which the jury would be asked to find the death of the infant daughter, and that she was murdered by the defendant. And in answer to an inquiry made by the defendant's counsel, he stated that he did not expect or propose to prove by any direct evidence that the infant daughter was dead or had been murdered, or that her dead body had ever been found or seen by any one ; but that from the lapse of time since the child and her mother, the defendant's wife, had been last seen on the 23d day of June, 1845, and from the other facts and circumstances he had stated in the opening, he should ask the jury to infer and presume and find that the infant daughter was dead, and that she was murdered by the defendant.

Hereupon the counsel for the defendant moved and insisted that the court should arrest the further progress of the trial for the want of proof of the *corpus delicti ;* that the rule laid down by Lord Hale, that "no person should be convicted of murder or manslaughter unless the fact were proved to be done, or at least the body found dead," is the rule universally acted upon by our courts, and should never be departed from.

The presiding justice decided that the most judicious disposition of the question now raised was to reserve it until the close of the evidence, that he might see what would be proved.

The counsel for the defence then called and had sworn, *Ephraim Schutt*, who testified as follows: I live in the town of Dryden; I lived there in 1843 and 1845; I had a sister by the name of Harriet, who was afterwards Mrs. Rulloff; my father's family lived in that town; first knew the defendant in May, 1842; he said he came from New Brunswick; said he was a German; spent part of the summer there; he was engaged on the canal at the time; the next winter he taught school; my sisters Jane and Harriet attended his school; the summer following he studied medicine, and afterwards practiced it; he married my sister Harriet the last day of December, 1843; that marriage was not much opposed by the family; the first winter they spent mostly at my father's.

Did they live happily together? Objected to; objection overruled. Defendant excepted.

There was some difficulty between them, but I never witnessed any; I once heard her crying in a room; went into the room; they were all there together; I asked him (Rulloff) why he treated his wife so; he made no particular reply; I said to him his conduct was very strange, and asked him if he could not conduct himself in a different manner, and if his wife was not agreeable, to leave her to us, but otherwise to stay; he finally concluded to stay; this was in the winter following their marriage; don't know of any other interviews in which there was difficulty.

*William H. Schutt* sworn: I am a brother of last witness; I never was present at any difficulties between him and his wife; some six months after his marriage I talked with defendant; he had left his wife once or twice; he said he disliked Dr. Bull and couldn't bear to have him near his wife; complained that Dr. B. had kissed his wife; Bull was his wife's cousin; this was their first meeting after the marriage; this conversation was on our way to Ithaca; he said he didn't think his wife had any intercourse with Dr. B., but he hated him; at another time he said (the same eve-

ning) pretty much the same thing as before; he then said he thought Dr. Bull and his wife had had intercourse together: said he thought he should leave her; that evening he thought he would go back to her; was present when Dr. Bull made his first visit to Mrs. Rulloff; my sister Jane was present; my wife was present; think Dr. Bull kissed them all around.

*Cross-examined.* I lived at Ithaca; had lived there from January 1, 1844, with my family; this was my second or third visit after my marriage; I was married the next day after Rulloff; went to Ithaca three or four days after my marriage; Dr. Bull lived three and a half miles from my father's; he was very intimate and often there; was a single man; sometimes he was there every week, and sometimes not for a month; I have to guess at the time of the kissing; I have no knowledge myself how often Bull had been there before; the time I saw the kissing was in January, 1844; that winter visited home often; Ithaca is seven or eight miles from my father's; Dr. Bull kissed my wife and Rulloff's wife; didn't kiss my mother or sister Jane; it was towards evening that Dr. Bull came in; Rulloff left that night; didn't then hear him say what for; he came back the next morning; can't say that Bull was there when he returned; I left Rulloff there; no difficulty after he returned that day; saw R. and his wife together; can't say what time of day I left; it was in the afternoon; my wife went with me; can't say when I saw defendant next; he was often down to Ithaca that winter; think at this time he was living in Ithaca; at the time I have been speaking of, he was clerking it a month or two months; while he was a clerk his wife lived with him in Ithaca; in a few days after his marriage moved with his wife to Ithaca; he boarded at Mrs. O'Brien's; I boarded there too; knew of no difficulty at that time; they appeared to be happy; at the time of the kissing Mr. and Mrs. Rulloff were up home on a visit; don't know how I and my wife went up; think it was in a

sleigh; my wife returned with me; can't say that Mr. or Mrs. R. returned with me; the interview of which I have spoken was some six months after the marriage; at that interview we were coming down to Ithaca on horseback; defendant was then living at my father's; during the six months he was part of the time in a store at Ithaca and part up to Dryden; when he left Ithaca he took his wife to her father's: this was in the fore part of March or February; I continued at Ithaca; he taught school the next fall after his marriage; he worked on the canal before he came to father's; what I mean is that he came up on a boat on the canal with my brother; afterwards went back on to the boat; came to my father's in spring of 1842; can't say how long he worked for my brother; he returned again on the boat, and then went to work on my father's farm; I first went to Ithaca in 1835; since then have lived there most of the time; he taught school in the fall or winter of 1842; it was a select school; taught school summer of 1843, six or eight miles from my father's; my sister attended that school the first winter for four or six months; think that winter I first heard that Rulloff was attentive to my sister; think his attentions continued throughout the summer; it was December. following she was married; then between eighteen and twenty years of age; we were on our road to Ithaca when Rulloff said he didn't believe there was any improper intercourse; it was in summer, about six months after their marriage; just before he had left my sister to stay away from her; don't positively recollect that Rulloff said so; he remained in Ithaca two or three days; boarded at Mrs. O'Brien's; she lived in Ithaca; then he went back to father's; I saw him next morning at my father's; then he and I came back together to Ithaca; that was the time when he said he didn't believe there had been any improper intercourse between his wife and Dr. Bull; before this interview he said he thought there had been illicit intercourse between his wife and Dr. Bull; can't tell where nor when

this interview was; he expressed himself that there was an intimacy; Rulloff began to keep house, in the fall of 1844, in Lansing, and so continued to next June, near Mr. Robertson's; I was there at the house once; they were living pleasantly; saw them often down to Ithaca together; think once they stayed all night; I thought he was a good provider for his family.

*Re-direct.* Once Rulloff and his wife came to my house with his child, at Ithaca; Rulloff sat at the window looking out, and took up the child and told Harriet to go with him, he didn't want her to meet Dr. Bull; he sat the child down; I then said I was tired of hearing about these troubles, and if he couldn't omit the subject I didn't want him to come; my child died June 3d, 1845, and my wife the fifth.

*Re-cross-examined.* Bull came to my house the day Rulloff was there; he didn't see Rulloff and his wife at all; defendant was in the parlor when he took up the child.

*Jane Schutt* sworn. Am a sister of the late Mrs. Rulloff; lived at home at the time of her marriage; not long after the marriage they had a difficulty; Dr. Bull came to the house on an errand, and Rulloff left; I didn't see any trouble except that Rulloff left; Bull came for a wheelbarrow; Rulloff stayed away till the next day; didn't hear Rulloff then say anything to his wife, but have heard him say he wished her never to see and speak with Bull; they had frequent difficulties about Dr. Bull; can't mention times; don't know of any other cause of difficulty; once in January or February after the marriage my sister was pounding pepper, and didn't pound it fine enough to suit him; he proposed to do it for her; she poured it back again, and he tried to get the pestle, and she said she would pound it; he snatched the pestle and hit her on the fore head; she carried the mark for some days; Rulloff left her once or twice while she was at my father's; shortly after their marriage they went to Ithaca; after that returned and were again at my father's; then went to Lansing; part of

the time for two or three months they roomed at a widow's near father's; when they first went to Lansing, lived in Mr. Bright's house; in April, 1845, moved to the one near Robertson's; went to the widow's in the summer.

*Cross-examined.* I went to Rulloff's school; I am older than Mrs. Rulloff; my sister was twenty when married; didn't see Rulloff leave the house when Bull came for the wheel-barrow; did not see him immediately on his return; don't think the pepper was a playful matter; didn't hear any angry words at the time; can't say what he said except that the pepper wasn't pounded fine enough; he drew the pestle from her and struck her; it was a marble pestle; I think it was a hard blow; it knocked her back several steps; he made some apologies; he said he didn't intend to strike her so hard; he appeared shocked and surprised that he had hit her so hard; she insisted that he did it on purpose; I was at their house at the widow's, and in Lansing: he provided tolerably; made her some presents; lived happily at times; at times not; once, at my father's house, he began to pack up things to leave her; took up her wedding dress, and said he wouldn't leave it, for in three weeks she would have it on and be with Dr. Bull; he went away; took nothing with him; very soon my father turned him away out of doors; don't think Rulloff was ever in my father's house again; in a few days his wife went with him; he met her; went to the widow's; stayed two or three months; they set their own table; from there they went to Lansing; I was there; they kept house there; was there the last of April or first of May; it was two weeks or less after her child was born; it was born April twelfth or thirteenth; stayed there about two weeks.

*Hannah Schutt* sworn. Am mother of Mrs. Rulloff; she was married on Sunday, and they went the same day to William's wedding; remained a month or so at Ithaca, then came back; I saw that she was unhappy; heard no conversation between them that I can relate; William's wife died

on the fifth and his child on the third; on the fourth of June, when Rulloff was about leaving, he said that if William's wife and child died he might thank himself for it, and we were little aware of the judgments that were coming on our family; Rulloff and his wife came to our house in May, 1845; stayed about three weeks; went back to Lansing, June sixteenth. A few days after they came home William came; said his wife was sick and wanted him to visit her; the next day Rulloff wanted me to go and take care of her; said he supposed I felt anxious for her to get well; then Rulloff said William had misused him, and it was wholly indifferent to him whether she got well; that William had misused him about Dr. Bull, and that thing would yet mount up to the shedding of blood; on the way to William's he said it was strange that I had raised so many children without losing any, but my gray hairs would yet go down in sorrow to the grave; he said William's wife and child have gone; who will go next? he said then Harriet and her babe would go next; this was the 5th of June, 1845; said William had misused him a short time before he was called to prescribe for the wife.

*Cross-examined.* William's child was three months old or more when it died; Dr. Bonney had attended her for Rulloff; the child was taken with convulsions; Rulloff was called to William's wife, who was sick first; she went into a decline and had a cough; she was sick about two weeks; she had been usually smart but took cold; she never recovered her health after her child was born; was imprudent in going out too soon; I went to William's Saturday; his wife died Thursday; I was at home when Rulloff was tried before; was not then sworn; didn't go to court at all; don't know why; I knew of the trial; I informed the family of this conversation shortly after it occurred; can't say that I have told anybody but my family; I have told it to Dr. Bull's mother; can't say when; I told my family of it before the other trial:

*Harriet Ackerman* sworn: Knew Mr. and Mrs. Rulloff; boarded at Mrs. O'Brien's while they were there; it was the summer after their marriage; they had some difficulty about William's going to Jefferson and not getting home in time; he wanted Mary Schutt to go home nine or ten miles a-foot; she was eleven years old; Mrs. Rulloff said. she shouldn't; after dinner they went up stairs; I heard a noise, went up; Mrs. Rulloff stood by the foot of the bed with a pillow before her mouth, and he had a vial in his hand; he said the d——d bitch was agoing to poison herself; he was not near her; she said, Oh, Edward, aint you ashamed of yourself? Mrs. Rulloff asked me why I didn't go to my shop; I went down stairs and started to go; went back into the room; then went out again and met Mrs. O'Brien and others going up; they had some words; he wasn't trying to do anything; I heard something like a blow; at this time Mrs. Rulloff put her hand on his head and said, you're mine forever, dear Edward, whether you live with me or not; he threw the vial out of the window; that night he took them home.

*Cross-examined.* She said she did not want me to hear the difficulty; was not sworn on the other trial; had mentioned this before; I saw the vial thrown out of the window, and the hand placed on the head; saw nothing else; I boarded with Mrs. O'Brien six months; Rulloff got a horse and carriage and took them away; they never came back there again; I am now twenty-nine years old; I was then tailoring; I lived at the time of the trial seven miles from Mrs. O'Brien's; I had gone home before the last trial; after that Mr. and Mrs. Rulloff lived together at Schutt's and in Lansing; Mrs. Rulloff wasn't hurt then that I know of; no personal violence was used that I saw; at times they seemed to live very happy; he did everything he could for her; was at Ithaca last August.

*Jane O'Brien* sworn. I kept the boarding-house spoken of; Mr. and Mrs. Rulloff were with me off and on; when

The People *v.* Rulloff.

they first got back from Jefferson it seems that the minister kissed both the brides; he, Rulloff, said if he was a woman he would murder a minister before he would permit him to kiss her; said he didn't believe in such habits; afterwards they went to a shilling party, and the minister kissed his wife again; this was about a week after; he was very angry; said he would never take her anywhere again; she went without a meal for two days; about three weeks after the marriage Dr. Bull called; kissed Mrs. Schutt and Mrs. Rulloff and Mr. Schutt; Rulloff got up and left the table; he came down stairs and went away; he didn't come back to dinner; Bull had then gone; Rulloff came back in a little while and went up stairs; then came down; then we, William's wife and I, went up and found her sobbing; the last of April or first of May, William went to Jefferson and stayed longer than Rulloff wished; the latter was very angry; Rulloff was determined that the child should go home on foot and pushed it towards the stairs; Mrs. Rulloff followed to the stairs; I heard something like a blow; as I went up I saw her, and she said, Oh, Jane, come up quick! Mrs. Rulloff said, Edward is going to make me take poison and take it himself; they were clinched together; he had the bottle in his hand, and I and she tried to take it away; I took hold of her; he said, By the living God, this poison will kill both of us in five minutes, and that would put an end to their troubles; he saw they were getting the better of him and he threw it out of the window; then they got over the excitement, and he began to twit her about Bull, and she dropped on her knees and said, Oh, Edward, I am innocent as an unborn child; he struck her in the face, and said, Get away, G—d d—n you; you know better than to come near me when I am angry as I am now; the blow knocked her over; she looked very red in the face; he then told her she could go and live with Dr. Bull, and seek all the pleasure she wished to, for he didn't want to live with her any more; he charged her with sexual improprieties; his language was pretty

broad; that was about all that was said; I advised him to go away and leave her; Rulloff said that before he would leave her to another he would serve her as Clark did his wife; Clark murdered his wife; said Clark was a gentleman, and he would chop her as fine as mince meat; that night he carried them back; two or three days afterwards he said he was going after his wife's clothes; that no other man should have them; he didn't get them; he came in about twelve at night, and sat down with a letter from William Schutt in his hand, and said he sometimes felt like destroying the whole family, and then being hung like an honest man, as Clark was; Clark was hung some twenty-six years ago.

*Cross-examined.* Lived in Ithaca; am not a widow; my husband now lives there; I am a cousin of the Schutt children; I was sworn on the former trial; didn't tell all of this story before; the part I told before was the difficulty about the girl, the sister, at my house; that was about all; was examined about five minutes; they told me I need not tell all then; that was before the trial; I met Mrs. Ackerman as I went up stairs; she turned and followed me up; was up there by the time I got there; some of the time they lived very quietly; he was a clerk in Hale's store; after that first difficulty she never appeared as cheerful as usual; used to go home together frequently; these were all the difficulties I saw between them; the one occasion as to the sister was all I mentioned before.

*Gerrit , Van Pelt* sworn: I knew Rulloff and his wife and Dr. Bull; think in June or July, 1844, had a conversation with Rulloff; he told me he saw Dr. Bull and his wife at the mill—this was before his marriage or after, as he said, and I can't now say which; he said he heard them talking together; that Bull said, Harriet, you have been seduced, and I think you might be again; that she turned it off with a laugh, and didn't appear to resent it at all; I told him I had always known Harriet and thought her discreet; at

another time Rulloff said, Gerrit, don't you see her life is in my hands?

*Cross-examined.* The first conversation was in Dryden, near Mr. Schutt's; the mill was close to Schutt's house; " se duced" was not exactly the word he used; I can't recollect whether he said they were married at the time I spoke of or not.

*Thomas Robertson* sworn: Lived in Lansing in 1845, and live there now; knew defendant and family; live on the middle road five miles north from Ithaca; for a few weeks he and I lived near each other, a scant mile and a half from the lake; his house was on the corner opposite mine; I was on the west side of the road, defendant on the east side, but the width of the road north; part of the time they, as was said, were at Mrs. Rulloff's father's; his family consisted of a wife and female child; in June, '44 or '45, Rulloff called on me for a horse and wagon between 10 or 11 o'clock; he wanted a wagon to carry a chest of his uncle's to Mottville; think, but am not certain, that he named his uncle as Boyce; Mottville is eight or ten miles from my place; I let him have the horse and wagon, but reluctantly, because it was an extreme hot day; he came for the horse a few minutes after twelve; he took dinner with us; just after dinner my son and he got the horse and went to his, Rulloff's, door; I saw them there and went over, and just as I got there defendant was pushing a chest towards the door, and took hold of it to put it in the wagon; I said, Shall I help you load it? he said, If you please, sir; I did it, and he went in the house, leaving the door about one-third open; I moved the horse across the street into the shade; subsequently he drove off; the end of the chest was heavier than if filled with ordinary clothing; my end weighed about sixty or seventy pounds; a part of this building had been previously use for a store; the windows had tight shutters; they were sometimes shut and sometimes open; the south windows were closed, and one-half of one towards me was open; am not positive about

this ; he went directly south on the road to Mottville ; that road did not communicate with the lake except by other cross roads that he could have taken ; there are woods upon these roads going to the lake ; after I hitched the horse R. came out with a flour sack or pillow case about one-third full and put it into the wagon ; have not seen the family since, he brought the horse and wagon back about twelve the next day ; the horse didn't seem to have been driven, wasn't sweaty ; was as hot a day as the one previous ; he took din ner with us that day ; at three or four P. M. I saw Mr. Rul loff going towards Mottville or Ithaca with a bundle in his hand ; bundle was tied up in a reddish shawl or handker chief.

*Cross-examined.* Think when I came back I noticed the horse ; not near ; nothing that surprised me ; we shoved the chest over the side of the wagon ; I lifted with one hand ; the wagon was near the shop ; the chest was shoved into the wagon without anybody getting in ; the south shutters were sometimes closed to keep the sun out, when the family were at home ; the chest was about as heavy as if stowed with books ; he had a library ; box wouldn't have held all ; afterwards some, most of them, were gone.

*Elizabeth Robertson.* Am wife of last witness ; saw Mrs. Rulloff last, June twenty-four, day before he got the horse and wagon ; she took some soap home with her, and said she would wait till the next day before she washed ; this was about nine in the morning ; she was at my house that P. M., had her child with her ; have not seen her since ; the shutters, that day that he took away the chest, were closed ; continued so till he went away in the P. M. ; they were all shut till he started to go away, and then he opened one ; I saw they were shut in the morning, and spoke of it ; this was unusual ; he came to our house between ten and eleven, and asked for a horse and wagon to go after his wife ; said his uncle came there the last night and left a chest there to make room in his wagon for his, Rulloff's, wife, and took the

wife to Henry Snyder's; he, Snyder, was not an uncle; lives in Dryden, three miles off; he wanted to take the chest to Mottville; I referred him to my husband; Rulloff then went to his house; had seen the chest he took away before; it belonged in the family; had been there ever since they kept house; defendant's child was a daughter about two months old; the morning when Mrs. Rulloff came for soap she had a calico dress on, dark, sleeves torn off above the elbow; noticed a ring on her finger that afternoon that I had never seen before; it was a valuable ring with a set in it; Rulloff took dinner with us both days; Mrs. Rulloff usually wore a large woolen shawl, white and black, small check, when she traveled; saw Rulloff the next day when he was going south; had this same shawl tied full and on his back; was going south; I asked where his wife was; he said she had gone between the lakes; I asked him when he was agoing to bring his wife back; he said in three or four weeks, maybe never; have seen that calico washing-dress since; went in the house with the family of Schutts three or four weeks afterwards; went with others; I saw that wash-dress lying at the foot of the bed on the floor; it lay on the floor in a heap; saw some shoes and stockings; know they were Mrs. Rulloff's, that she had worn the day before; they were before the bed on the floor; saw a skirt in another room hung up; part of the bed was on a chair; bed was not made; saw her traveling basket there, which she carried when she traveled; she had but one; saw a small pair of child's socks in the basket; saw the dirty clothes in the wash-room; the soap had been emptied out of the tin pail into a wooden pail; some of the table dishes were on the table.

*Cross-examined.* Had known them from October till March; they then lived in Bright's house, half a mile off; Mr. and Mrs. R. were always very kind to each other when I saw them; they had lived opposite our house two or three months; moved there in July; couldn't say how the shut-

ters were when they came there; they never shut the windows when they went away; they "want" shut very often; didn't mention about the windows when sworn before; did speak of the shawl then; recollect that I did; there are two rooms; a bed-room in the house, also a clothes press; the kitchen was the largest room, and the bed was there; the wash-room was back of the house; Mrs Rulloff was then in good health; in the afternoon when she called she had not the washing-dress on; she was dressed up; she wore several dresses at different times; before she went home she said Edward was away, and she shouldn't wash till he came back to carry water; the first day he said his wife had gone to Snyder's; I have forgotten how I testified as to the second conversation on the former trial; can't say what day of the week it was that she borrowed soap; it was not Monday, it was Tuesday or Wednesday; the night of the day she came for soap I heard a double lumber wagon turn around to Mr. Rulloff's house, and heard it start away again in fifteen or twenty minutes; it was between eight or nine o'clock; it was between ten or eleven o'clock; it went south; can't say who was in it, or how many; remember to have heard Rulloff's door shut after the wagon left; closed my door at the same time; can't recollect that the wagon went east; haven't conversed with any one about the way the wagon went; have heard that Dr. Burdick drove that way within a year; it was a dark night; don't know whether it was moonlight; the wagon stood hitched on the east road, between Rulloff's and Fields'; heard it turn around; can't say which way, south or east; it drove off; Mrs. Rulloff that afternoon stayed to tea; didn't see Rulloff when he returned with the wagon; we dined about twelve o'clock; can't say how soon after he went away; the ring wasn't taken off at our house; I spoke of it as she was wiping dishes; it was all of six weeks after Mrs. Rulloff's disappearance that we went there; the blinds were on the west and south; three or four windows had blinds; there were no

east nor north windows; noticed the blinds were closed in the morning of the day when he went off with the chest; one blind was open when he came with the wagon; this was the first time I had seen the blinds closed.

*Re-direct.* This wagon came close to Rulloff's; Fields lived a short distance off.

*Re-examined.* This shawl was a winter shawl; don't know that she had another; in traveling in the night, in June, she would usually have worn it.

*Dr. John F. Burdick* sworn. Reside in Lansing; I am a physician; practice there; I visited a patient at Mr. Fields' about the time of the disappearance of Mrs. Rulloff; I visited her in the night with a horse and sulky or buggy; Fields' is about three rods from Rulloff's; I came between eight or nine o'clock, and hitched my horse opposite the east end of Rulloff's house, and went to Fields' house and stayed till about eleven o'clock; I went and unhitched my horse and drove up east towards Mrs. Fields' to talk with her, and then turned around and west to the middle roads, and then drove south home; I heard Robertson's and Rulloff's doors close as I was turning my horse to go home.

*Cross-examined.* I was at Fields' two or three hours; it was on the twenty-third of June that I was there; think it was on Monday, the night there were some squaws in the neighborhood; I conversed with Mrs. Fields before I turned around, and when I turned around I went directly home.

*Olive Robertson* sworn. I am a daughter of Thomas Robertson; I remember the time the squaws were there; I was at home that night; Rulloff was at our house; he told me to go to his house, that his wife might be afraid if she knew that Indians were there; I stayed till nine o'clock and went home; Mrs. Rulloff was holding her child in her lap when I went away; nobody else was there when I was first there till defendant came with the Indians with him; Indians stayed a short time; while they were there defendant showed Mrs. Rulloff and myself the jewelry and moccasins the Indians

had with them; defendant then gave the Indians something I thought was money; after the Indians left, I think I saw him stirring something in a tea-cup; think he said it was composition tea; he was stirring it with a spoon in a tea-cup; never saw Mrs. Rulloff or child since.

*Cross-examined.* Defendant told me to go to his house, that Mrs. Rulloff would be afraid alone, if she knew Indians were in the neighborhood; there were two of them; no children; wore blankets and head-dresses.

*John W. Gibbs* sworn. I live in Lansing; I knew defendant in 1845; about the time his wife disappeared, defendant stopped as he was going north with Robertson's horse and wagon and a chest in it; it was about twelve o'clock; he drove at a moderate gait as usual; I live about eighty rods south of Robertson's; I saw Rulloff again between two and three P. M.; he was on foot, some ten or fifteen rods from me; he said, "Good bye, pap;" that he and his wife were going to visit between the lakes five or six weeks, and would visit me when he came back; he had a bundle, and was going west, towards Ithaca.

*Cross-examined.* Defendant always treated his wife friendly so far as we knew; we visited back and forth.

*Elijah Labar* sworn. I reside in Ithaca, one and a half to two miles south of Robertson's; knew defendant in 1845; remember the time of his wife's disappearance; saw him pass my house, with Robertson's horse and wagon, about two o'clock, P. M.; was a chest in the wagon; he was alone; he was going south; the road led to Mottville and Varna.

*Newton Robertson* sworn: I am son of Thomas Robertson; defendant had father's horse and wagon; I steadied one end of the chest in the wagon when it was loaded; defendant and father had hold of chest; Rulloff returned next day with a chest; I didn't help lift chest out or lift it after it was out; I think it was the same chest that went away; he got

The People *v.* Rulloff.

back some time in the forenoon; I believe Rulloff took it out himself without difficulty; it did not seem heavy.

*Cross-examined.* I looked at the chest and thought it was the same one; I did not examine it to see if it was the same or another chest; I saw Rulloff take it out of wagon in front of his house, before the horse was taken from wagon.

*Henry Snyder* sworn. I live in Dryden, three or four miles from Robertson's; I am not related to the Schutts; my son is; no other Snyder is related to them; the family usually call me uncle Henry; I did not carry, in 1845, Mrs. Rulloff to my house; she was not at my house in June or July, 1845; don't know about her going to Mottville or between the lakes; I never left a chest at Rulloff's or anywhere else.

*Cross-examined.* I did not see Mr. or Mrs. Rulloff alone that time; there is no other Henry Snyder in the neighborhood; I have five or six brothers; six sons.

*Emory Boyce* sworn. I live in Caroline; Mottville is about one mile west of my house; my wife and Mrs. Rulloff are cousins; visited together before her marriage; Mrs. Rulloff was not at my house in June or July, 1845; nor was defendant; defendant and wife were at my house in 1844; no chest was left at my house, in 1845, by Mr. Rulloff or any other one; know nothing about any chest.

*Jane Schutt* recalled. About the time of my sister's disappearance, defendant was at Ithaca, the day after the Indians were there, twenty-fourth of June; it was before noon; don't know how he came; he said he and Harriet were going away out between the lakes; that a family visiting in Lansing had advised him to go; that he thought he should go and stay five or six weeks, and might return; he said he was hungry; would not wait for me to get him something to eat, but went down to the cellar and eat ravenously, taking his food into his hands; I understood his wife was at home then; I gave him some of William's babe clothing; he first objected to taking it, but finally did so; he stayed half an hour; said he was going back home; saw him again

the same day, in the afternoon, near five o'clock; I said I thought you were gone to between the lakes; he said the family with whom he was going would not go till next day, and he came to have us tell uncle William Schutt, at Mott ville, that he could not go and deliver a lecture up there; he stayed two hours; said he was going with that family on the morrow; Mrs. Rulloff had a ring with a set in it; she had had it several years; after tea he said don't my face look red; I said it did; he said he had walked five miles very fast, and it made his face red; he then read the Mysteries of Paris, and commenced weeping; said he never could read that part of the book without crying; after that he took out the ring from his pocket and asked William if he remembered it; William said he did; he gave it to his sister years ago; defendant said, Don't you want it? William said, No, give it back to your wife; defendant said his wife gave it to him while at her father's, a number of weeks before, and he had carried it since. A box is shown witness, which she says defendant made at her father's house, and witness recognized a bead work-box, wrought collar, belt, wristlets, as articles that belonged to Mrs. Rulloff; recognizes pieces of silk as the same as her wedding dress; also the hose, she thinks, but not the elastics; cotton hose, worked with silk; also a card engraved "Edward H. Rulloff." I went to the house after the disappearance; saw some articles I recognized; a delaine dress, calico wash-dress, quilted skirt, shoes and stockings; can't say where the skirt was; think there were elastics with shoes and stockings.

*Cross-examined.* I was examined eleven years ago; I was then examined mostly about the striking; think I did not testify about the conversation at William's on twenty-fourth June; I had not kept those facts secret; have told them to William; he was sworn on the other trial; I think I did not swear about the ring; think brother William did; I recollect most distinctly the piece of wedding gown, the wrought collar and wristlets.

The People *v.* Rulloff.

*William H. Schutt* sworn. I remember Rulloff at my house the day after the disappearance; I saw him at tea; he spoke of his face burning; asked if it didn't look red; said he had walked some ways; after tea he took the ring out of the vest pocket; he asked if I recognized the ring; I said it was one that I gave his wife several years ago; he said, Don't you want to take it back? I said, No, give it back to your wife; he put the ring back; said he had carried it since his last visit to my father's; my sister usually wore that ring; he said he was going between the lakes next morning; should take his wife along; that he had some prospects of getting in business; he stayed till after tea and went down to the store with me, and after a little he went out; returned shortly after and got a rocking chair that belonged to him; saw him again about nine o'clock that night, at Dr. Stone's office, bringing a chest out or pulling it towards the door; he had studied at Dr. Stone's; I don't know what he was going to do with it; I next saw him about six weeks after; I have never seen his wife since; six weeks after, he came into Hale's store, in Ithaca; he said he had come from between the lakes, near Geneva; I asked if his wife was there; he said she was; no place named; I asked him up to my lodging room, and asked him if he had heard of a report there was about his murdering his wife and child; he said he had not; he seemed to be somewhat surprised that they should think any such thing; he asked if it would be prudent for him to go out in the street; while he was eating he said his wife was in Pennsylvania, near Erie, in about two hours' ride of my brother's there; that he had not been to my brother's; hadn't had time; I said I thought it strange that he got her off so far, as she said she would not go far from home; he said he got her on the railroad, and she, not being used to traveling, was going much faster than she supposed she was; didn't say with whom she lived; he stayed in the room with me that night; his eyes were sore; I wrapped them up in cloths; he appeared restless

during the night; I asked him what troubled him; he said it troubled him to think the people had that opinion of him, that he would murder his wife and child; I told him to be easy and I would explain it; the next day, in the afternoon, he left the store to go to my father's; in the course of a week he came back to the store; he remained from before noon till evening, when he left; Henry and Jane came down with him; Rulloff said he would not give any information about his wife; we wanted him to stay till we could get a letter from her; he said she was in Ohio, in Madison; didn't say whom she was with; after some conversation, he said he would remain and write to her; he went to my house and wrote the letter; after the letter was finished, Ephraim came down to the store with him; he had written a letter to his wife, and a letter to Depuy, directing him to get the letter to his wife; it was directed to Madison, Lake county, Ohio; he agreed to remain for an answer; he left that evening; chest at Dr. Stone's was a dark colored chest; defendant was gone several days, when he came back, with my brother Ephraim, under arrest; after he was in jail I saw him; he said his wife was living and well provided for; didn't say where she was.

*Cross-examined.* Defendant took tea with me and took the chest from Dr. Stone's on the same day; that was the only day I saw him that week; I supposed generally defendant and wife lived happily; he provided well for his family and often carried presents to her, at one time oranges; I and my wife boarded with them at Mrs. O'Brien's; afterwards separated, but visited together; I have not seen or heard anything from my sister or her child since June 18, 1845; don't know whether they are living or dead.

*Jane Schutt* recalled. When Rulloff came back at the end of the six weeks, he said his wife was at Madison, Lake county, Ohio; I saw him write the letter to her; I saw my brother take the letter; there were four gentlemen chosen who labored hard one afternoon to get Rulloff to tell where

his wife and child were; the tenor of his letter was to have her write that she was alive; he read the letter to us in the evening; Ephraim took it; then Rulloff asked me to go after a drink of water; as I went down, I saw a bundle on the bureau; when I came up I missed it; I kept my eye on him; he walked back and forth for a while as if he wanted to get rid of me, then went on to the front stoop, and then went off suddenly; the bundle was missing; I sent word to the store that he had left.

*Milton Ostrander* sworn. I live in Ithaca; was employed in Babcock's livery stable in 1845; Rulloff got a horse and wagon of us on the evening of June twenty-fifth; got a lumber box wagon; got it about dark; said he wanted to go three or four miles; he had Dilworth's wagon.

*Eber Babcock* sworn. I am one of the owners of this livery stable; Rulloff returned the horse and wagon about three A. M.; the date on the book was June twenty-sixth; the wagon belonged to one Dilworth.

*Edmund H. Watkins* sworn. In 1845 I lived at Ithaca; was a stage agent; I knew Rulloff by sight; a man took the stage for Geneva; entered his name as John Doe; this was defendant; he had two chests, or a chest and a trunk chest; wasn't much difference in their size; the chest was brown; the other, I should think, was put together for the occasion; first saw them in the stage office in the Clinton House.

*Cross-examined.* This was in the morning, about seven o'clock, of the twenty-sixth of June; I was a little surprised at the name; by information I knew him; I did not know him personally; didn't see him again until the trial in 1846.

*Harrison Robertson* sworn. I lived in Trumansburgh in June, 1845; went out on the stage only once that year; Rulloff went out with two chests as baggage; he gave his name to the proprietor as John Doe; he went on through Trumansburgh.

*Cross-examined.* The chests were two painted chests, about the same size; Rulloff said they contained books.

*John F. Burdick,* recalled. Two or three weeks after Rulloff left I went into the house after some books he had borrowed of me; Fields and I went in; I didn't find my books; I got my books afterwards; saw some dirty clothes in the wash-room; saw a skirt at the foot of the bed laying in a circle; also stockings, shoes, elastics; some dishes on the table, unwashed; noticed a stove; a line with some diapers; on the stove a tin wash-dish; one or two diapers lay near the door; saw the wash-tub; three or four weeks after I went in with forty or fifty men, and found the things about the same as at first; think the Schutts were there; sheriff Porter took the lead; the bed was in disorder; in the bed-room was a bureau, and on top a miniature bureau; Porter found an invoice of his effects; saw the traveling basket.

*Cross-examined.* We got the key of Mr. Fields; nothing was disturbed the first time I went to the house.

*Richard K. Swift* sworn, says: I reside in Chicago; lived there in 1845; dealt in money; principally in real estate; think in 1845 my brother was applied to for a loan by a man; my brother refused; heard the man say he had lost his wife and child, and was out of money; I said to brother if he didn't let him have the money I would; I let him have $25 or $30, for which he gave me his note, signed, I believe, James H. Revillee; he left as security for the payment of his note, a brown chest, snuff brown; I think about eighteen or twenty inches across ends, three feet or more long; as near as I can now remember, he said his wife and child died south of Chicago, on the Illinois river, in Illinois; I think he said they died about six weeks before; I was at Ithaca in August last; saw defendant; I thought I recognized him; I might not have recognized him in a crowd; he told me if he didn't return in a certain time I was to write to a certain place near, I think, the Mohawk river,

and he would remit the money; I wrote and received no answer; I then, with Dr. Dyn and others, opened the chest; found a good many books; the box now in court, a sheet, and some other things; he was there with me and got the money August 4, 1845; that was the date of the note; I have a statement, made out February 18, 1847, of contents of the box; I remember a large bundle of papers, lectures on phrenology, Hooper's Dictionary, E. H. Rulloff written on inside cover; some of the names were erased; names of places rubbed out; so of names of persons; small box contained women's fixings; papers in bottom of box; letters; cards marked Edward H. Rulloff; a paper on which were the words, "Oh, that dreadful hour!" one lock of light brown hair in paper, labeled a lock of Harriet's or Mary's hair; I thought Harriet; think the chest was heavy with books; saw a pocket-book in box; can't identify it; style of card is the same; pair of hose like these; remember a piece of silk and a bead bag like this; remember a collar like this; the small box was in our house for many years; the lock of hair was lost, and so of the loose pieces of paper on which the words were written; I remember a figured lace cap for an infant; the silk was light colored, ash colored; there were a lot of small sea-shells.

*Cross-examined.* Defendant looks like the man I loaned the money to; I next saw him in Ithaca last August; I think he said his wife and child died on Illinois river; think he said he had a farm down there; think he said it was six weeks since they died; I think I expected him back in November; note was due October 4, 1845.

*Mrs. Richard K. Swift*, sworn, says: I am wife of last witness; remember his bringing this box home; identified the articles remaining in box as the same; the infant's cap was used up; remember the hair but not that it came in the box.

*Aaron Schutt*, sworn, says: I live in Dryden; am brother of Mrs. Rulloff; before Rulloff went away in August and

Ephraim followed, defendant wished me to go with him and carry him and his goods to Montezuma in a two horse wagon; I said I could not go; he said he would help me in harvest if I would go, and did so; I think I did not agree to go; I advised him to take them to Ithaca with a one horse wagon; he wanted to save expense by my carrying them to Montezuma; Ithaca was five miles from his house; Montezuma was forty or fifty miles from our house.

*Ephraim Schutt,* recalled, says: There is no landing on the lake nearer defendant than Ithaca; I visited defendant's house when suspicions were raised; I know defendant had a cast iron mortar that would weigh twenty-five or thirty pounds; he had flat irons; on search could not find anything of them; I agree with Dr. Burdick as to appearances at the house; I was at Hale's store in Ithaca five or six weeks after Mrs. Rulloff's disappearance, and saw Rulloff enter the store; William shook hands with him, and asked him where he had been; he said, between the lakes; William asked where his wife and child were; he said, between the lakes; William and he went up stairs, and I saw no more of him that day; next saw him, when he came back from my father's, at William's; I was there when several gentlemen came in to ask him about her; he would give no definite satisfaction; they left him and told him that he would probably be detained; after they were gone he asked what he had best to do; I told him to write to her immediately, and asked him if he would remain until they got an answer from my sister; he said he would; that she was at Madison, Lake county, Ohio; he then commenced writing his letter; wrote one and tore it up; after that wrote another; after dark he directed the letter to N. Depuy, Madison, and gave it to me to show the gentlemen, and mail; I did so; shortly after I mailed the letter I was informed defendant had left; I pursued him; I went across to Geneva; got there early in the morning; searched first train but could not find him; at Rochester we changed cars; there I saw him and he me;

I remained in car till the train was in motion; then went through the car; found him on last emigant car, on back platform, with bundle in his hand; he said he would go with me where my sister was; we went on together to Buffalo; I said we would stop at the Mansion House; he objected; expressed some fear that the officers would be after him; we finally went there; I called for a room and both occupied it; I said I would enter my name on Hotel book; he said he would sleep on floor, as there was but one bed; he took off his shoes; his feet were blistered badly; said he blistered them walking from Ithaca to Auburn; he got to sleep; I locked him in and went away; came back; he was frightened as I came in; said he thought it was officers from Ithaca after him; next morning we went down to the boat; got tickets for Fairport; he paid for them and while I was looking about for a place to sit down, and while crowding through the crowd, he disappeared; the boat started, and I failed to find him on board; I then stopped at Erie, where I had a brother living; I inquired of him, but could hear nothing from Rulloff or his wife; in the morning I took another boat and went to Fairport; with a a private conveyance I went to Madison, and inquired for N. Depuy and Mrs. Rulloff; could hear of no such persons; no Mr. Depuy had ever lived there; it was a small place, quite small; I left their names with persons and asked them to write if any such persons were heard from; I went from there to Cleveland; obtained a warrant; went down to landing; saw two large steamers coming; Rulloff was on the second boat with the emigrants; I then went after an officer; when I came back I found him in an eating-house, behind a dry goods' box; I pointed him out to the officer, who approached him and said, Is your name Rulloff? he said, No sir; I said, It is he; then he was arrested, and I then brought him back and he has since been in confinement; he since told me his wife and child were living, but he would not tell me where they were.

*Cross-examined.* Heard the officer pronounce the name of Rulloff; the sheriff told him that he would keep him in irons unless he would consent to go ; I got a warrant in Buffalo from a magistrate, without examination, and brought him in irons from Buffalo ; I recollect hearing the officer call the name ; never have seen anything of the wife or child or heard anything.

The foregoing is all the evidence given on said trial.

Whereupon the counsel for the defendant renewed his motion, made at and upon the opening of the cause to the jury, and insisted that as it now appeared that no direct evidence of the death or the murder of the infant daughter had been given, no conviction for murder could be properly had or allowed, and that the jury should be so advised and instructed, and should be directed to find a verdict of not guilty. But the court declined, and refused so to advise, instruct and direct the jury; to which refusal the counsel for the defendant excepted.

The cause was then summed up to the jury by the counsel for the respective parties, and the presiding justice charged the jury as follows :

*Gentlemen:* The prisoner at the bar, Edward H. Rulloff, was indicted in the Tompkins County Oyer and Terminer for the murder of his infant daughter, about three months old. The indictment was carried into the Supreme Court by *certiorari*, and the cause came down to the Tompkins Circuit in August last for trial. The court, being unable to obtain a jury in that county, ordered the trial to be had in this county, and hence in the discharge of my duty, as judge presiding in this circuit, the duty of presiding on this trial has unexpectedly fallen upon me; and the same act which has devolved this highly responsible duty upon me, has also cast upon you the great responsibility of determining this traverse between the government and the prisoner at the bar. The charge against the prisoner is no less than the murder of his own infant daughter of two or three months

of age. Murder, under our statute, is defined to be the unlawful killing of a human being. First. When such killing is perpetrated from a premeditated design to effect the death of the person killed, or of any human being. Second. When perpetrated by an act imminently dangerous to others, and evincing a depraved mind regardless of human life, although without any premeditated design to effect the death of any particular individual. Thirdly. When perpetrated without any design to effect death by a person engaged in the commission of a felony.

You should not forget, gentlemen of the jury, that we commence this trial with the presumptions all in favor of the prisoner. The law, in its clemency, presumes the entire innocence of the prisoner, and the government, before they have a right to ask the conviction of the prisoner, are bound not only to prove the alleged murder, but are required also to adduce evidence to establish the guilt of the prisoner beyond any reasonable doubt. In order to maintain their case, the government are called upon to prove, first, that a murder has been committed; and secondly, that the prisoner at the bar is the person who committed such murder. The first branch of the case, the *corpus delicti*, as it is termed in the law, by which is meant the body of the crime, the fact that a murder has been committed must be clearly and conclusively proved by the government. The *corpus delicti* is made up of two things: first, of certain facts forming the basis of the *corpus delicti*, by which is meant the fact that a human being has been killed; and secondly, the existence of criminal and human agency as the cause of the death. Upon this first branch of the case the counsel for the prisoner claims and insists that it can only be proved by direct and positive evidence; that the government must prove the fact of death by witnesses who saw the killing, or at least the dead body must be found. It has been said by some judges that a conviction for murder ought never to be permitted unless the killing was positively sworn to or

the dead body was found and identified. This, as a general proposition, is undoubtedly correct, but like other general rules has its exceptions. It may sometimes happen that the dead body cannot be produced, although the proof of death is clear and satisfactory. A strong case in illustration is that of a murder at sea, where the body is thrown overboard in a dark and stormy night, at a great distance from land or any vessel. Although the body cannot be found, nobody can doubt that the author of such crime is guilty of murder. In such a case, the law permits the jury to infer that death has ensued from the facts proved. The circumstances being such as to exclude the least, if not almost every, probability that such person could have escaped with life, and yet there is a bare possibility in such a case that the person may have escaped with life. I am of opinion that the rule, as understood in this country, does not require the fact of death to be proved by positive and direct evidence, in cases where the discovery of the body after the crime is impossible. In such cases the fact may be established by circumstances, where the evidence is so strong and intense as to produce the full certainty of death. By the proof of a fact by presumptive evidence, we are to understand the proof of facts and circumstances from which the existence of such fact may be justly inferred. The facts and circumstances to establish the death in the case of murder, in the absence of any positive evidence, must be so strong and intense as to produce the full certainty of death, or, as Mr. Wills, in his *Treatise on Circumstantial Evidence* (*p.* 162; *Burr. Cir. Ev.*, 680), says, the death may be inferred from such strong and unequivocal circumstances as render it morally certain and leave no ground for reasonable doubt. The government claim that they have proved the body of the crime in the case under consideration up to the strictest requirements of this rule. This is for you to determine, gentlemen of the jury. The determination of it involves the examination of all the facts and circumstances disclosed by the evidence in the case.

I am very much relieved from calling your attention to these facts and circumstances by the very full and able argument of the counsel for the prisoner and the people, who have rendered you very great aid in your duties, and have relieved the court in the performance of its duty by their comments upon the evidence of the case. This question is to be determined by you, gentlemen of the jury, in view of all the evidence reflecting in the least degree upon this branch of the case.

The government places great reliance, to establish the death in this case, upon the sudden disappearance of this woman and child under the circumstances of this case, without any apparent cause, and the failure to find either the mother or child after the most diligent search for eleven long years. The fact is very proper to be taken into account in determining this question, and is a fact of no little importance in determining the question; but, although this unaccountable disappearance and failure to ascertain any trace of them may lead to a strong suspicion that those parties have come to an untimely end, yet they are not alone sufficient proof of the death of this child and mother to justify a conviction, because the fact may be accounted for on the hypothesis (however improbable) that they may have absconded and eluded all inquiry, or may be kidnapped and concealed and be still alive, and upon this branch of this case it is your duty to take into consideration the fact, which seems to be admitted on this trial, that the prisoner at the bar was convicted in the year 1846 of having abducted his wife alive.

The government rely on the confessions of the prisoner made to and proved by Mr. Swift, to prove the death of this child; Swift proves the prisoner in Chicago, on the 4th of August, 1845, and he says that he told him he had lost his wife and child about six weeks before. He stated that they died south of Chicago, in Illinois, about six weeks before. It is for you to say, gentlemen of the jury, what construction should be put upon this language. You are required

by the law to take this confession all together, as well that which makes for the prisoner as that which makes against him. The law, however, does not compel you to adopt the whole confession, if you find that the other evidence in the case proves any part of the confession to be untrue. I should say to you, however, that confessions are a doubtful species of evidence, and are to be received with great caution by both courts and jurors; and the law requires me to say to you that no man can be convicted of a criminal offence upon his own confession alone that a crime has been committed. 'Confessions are competent evidence in the case, but alone are not sufficient.

You have listened to the detail of the evidence adduced by government from the evening of the 23d of June, 1845, when the prisoner at the bar is proved to have been in his 'own house with his wife and infant child, up to the time when he is arrested in the city of Cleveland and brought back by Ephraim Schutt, and lodged in the Tompkins county jail, and all of these facts and circumstances have just been so ably and elaborately commented upon by both the counsel for the prisoner and the people, and the legitimate deductions to be drawn therefrom have been so fully presented to your consideration, that I am relieved from the duty of going over the evidence. It is proper, however, that I should state to you the rule which should govern you in the ultimate conclusion to be attained from the evidence in the case.

In regard to the first branch of the case, the establishment of the *corpus delicti*, the body of the crime, before you find it against the prisoner, you must be satisfied, from the evidence in the case, that it is established by presumptive evidence of the most cogent and irresistible kind; that it is established by circumstances proved so strong and intense as to produce the full certainty of death.

In regard to the second branch of the case, by which we mean the traverse between the government and the prisoner

as to the question of the defendant's guilty agency in the
commission of the alleged murder, as to this question of the
defendant's guilt of the crime imputed, the rule which
should govern is this : The government are required, before
they can claim a conviction, to prove, by their evidence, the
guilt of the prisoner beyond any rational doubt.

If, upon a full and fair consideration of all the evidence in
the case, doubts remain in the minds of the jury, it is the
duty of the jury to acquit.   Upon this branch of the case
the doubts, however, which require an acquittal should be
rational doubts.   They are not doubts which may arise in
a speculative mind, after the reason and judgment are
thoroughly convinced by the evidence in the cause.

To so much and said parts of said charge and instructions
given to the jury as submit to them to infer, presume and
find, without direct proof, the death and the murder of the
infant daughter, the counsel for the defendant excepted.

The jury returned a verdict of guilty.

The defendant, having made a bill of exceptions, moved
for a new trial, and the cause came on to argument before
the Supreme Court at general term in the sixth judicial
district.

*Joshua A. Spencer,* for the prisoner.

I. The counsel for the prosecution, in opening the cause
to the jury, distinctly admitted that he did not expect or
propose to prove, by any direct evidence, that the infant
daughter of the prisoner was dead or had been murdered,
or that her dead body had ever been found or seen by any
one.   Upon this admission the court should have stopped
the prosecution.   "In these cases of homicide, the precau-
tion of Lord Hale seems to be enough for laying the foun-
dation of circumstantial evidence : 'I would never convict
any person of murder or manslaughter, unless the fact be

proved to be done, or at least the body found dead.' (2 *Hale P. C.*, 290.) A departure from this important suggestion, which is now universally acted upon, was a capital error in *Miles' case* (*cited supra, from Phil. app.*) The body being afterward found, it plainly appeared that the death was accidental. In the two illustrative cases cited by Hale, one of the persons supposed to have been murdered was sent on a long sea voyage and the other had run away. The late remarkable case of *Stephen and Jesse Boorn*, in Vermont (*Boorn's case, Burr. Cir. Ev.*, 579, *note C*), was in truth of the latter character, though the prisoners actually confessed their imputed guilt." (1 *Cow. & Hill's Notes*, 394.) In the case of *The King* v. *Burdett* (4 *Barn. & Ald.*, 161 ; 6 *Com. L.*, 386 ), a case of libel, Chief Justice Abbott, in discussing the doctrine of presumptive evidence, says : " It was said, and truly said, on the argument, that guilt and crime are never to be presumed ; and the cases of supposed murder mentioned by Lord Hale, and which have since operated as a caution to all judges, were quoted on this occasion. But the cases are wholly different. In those cases there was no actual proof of the death of the person supposed to have been slain, and consequently no proof that the crime of murder had been committed. The *corpus delicti* was not established." Nor was it in *Boorn's case*, though the guilt was confessed. Nor in the case at bar, for it is more barren of proof of death or murder than any case reported. No bloody weapon or blood stains or marks of violence shown.

II. At the close of the evidence, with an entire failure to prove any death or murder, or the production of the dead body, the learned judge should have instructed the jury, as requested, that they should acquit the prisoner ; that the law did not permit a conviction for murder without proof of the *corpus delicti ;* that the rule of Lord Hale is the true rule, by which courts and juries have since been governed. He erred, also, in charging the jury that without such proof they might lawfully convict the prisoner of the crime of

murder.  In 2 *Starkie's Evidence*, 944, this rule is recognized as the true rule.  He says : " The proof of killing another involves the proof of the death of the person, and that it was occasioned by some act done by another;" and he cites Lord Hale's rule with approbation.  In the case of *Webster* (5 *Cush.*, 295), if the body of Parkman had not been found and identified, and a felonious killing proved, no one would have thought of convicting Webster of his murder.  It is called a case of circumstantial evidence, but the rule of Lord Hale is adhered to ; the dead body was found and identified, and its condition proved its violent death.  Who was the murderer was proved by circumstantial evidence, as it always may be.  In the case of *Wilbor* for the murder of Barber, tried at the Madison Oyer and Terminer, the parties were co-travellers on a canal boat, left together at Canasaraga to cross a piece of woods and join the boat at Chittenango.  Wilbor joined the boat alone and said Barber had gone on to Syracuse, and claimed to take charge of his trunk.  The next spring a human skeleton was found in the woods between Canasaraga and Chittenango, the skull of which was broken, apparently by a stone lying near by ; the clothes were identified as Barber's, by his daughters, and they had several holes through the vest and pants, as if cut by a dirk, and a wallet was found in a pocket of the clothes, which was also identified by the daughters.  Wilbor was convicted and executed.  Now, would any one have thought of convicting Wilbor of murder if the body of Barber had not been found and identified?  The death (killing) is proved by direct evidence, and also the identity ; but who was the murderer was alone proved by circumstantial evidence.  The rule of evidence for which we contend is well stated by Burrill, in his *Treatise on Circumstantial Evidence* (*p.* 678) : "In cases of alleged homicide, the proof of a *corpus delicti* involves that of the following points or general facts : First. The fact of death, particularly as shown by the discovery of the dead body or its remains ; Secondly. The

identification of such body or remains as those of the person charged to have been killed; and, Thirdly. The criminal agency of another as the cause of the death. First. The fact of death. This is the basis of the *corpus delicti;* and the circumstance which furnishes the best proof of it, as well as the most effectual means of ascertaining its cause, is the finding and inspection of the dead body itself. Hence, it is a general rule of evidence that a dead body must have been discovered and seen, so that its existence and identity can be testified to by eye-witnesses. It is considered unwarrantable and dangerous to infer the fact of the death of a person from the circumstance of his sudden and unaccountable disappearance, even when followed by long continued absence, and even although such circumstances may be connected with others apparently casting suspicion upon a particalar individual." It is true that the rule that the dead body must be found has its exceptions, as in cases of piracy, where the body is thrown overboard, or where the body is destroyed by other means; but in all these cases the other alternative of Lord Hale's rule is satisfied, "the fact, killing, is proved to be done," by direct evidence, as shown by all the cases cited to illustrate the rule. A death must be proved by direct evidence. When the death is shown, if by the dead body being found, the question arises, by what cause? Was the death natural? Was it accidental? Was it by suicide? Was it a felonious killing by another, and by what means? and by whom? All these questions may be answered by circumstantial evidence. But before any of them can arise a death must be proved. If by any other evidence than the dead body, it must and will show why the dead body is not found, by what means the killing was effected, and by whom; and these facts must be established by direct evidence; and they were so established in all the reported cases, where the dead body was not found. (2 *Stark. Ev.,* 944.) In *Wharton's American Criminal Law* (283), is found this language: " There must be clear and unequivocal proof of the *corpus*

*delicti.* The fact of the commission of the offence must necessarily be the foundation of every criminal suit; and until that fact is proved, most dangerous would it be to convict." He cites Lord Hale's rule, and then adds: " Equally emphatic was the language of another great judge (Lord Stowell): ' To take presumptions in order to swell an equivocal and ambiguous fact into a criminal fact, would, I take it, be an entire misapplication of the doctrine of presumptions.' The death, in such a case, should be distinctly proved, either by direct evidence of the fact, or inspection of the body. The proof must be clear and distinct." In *Roscoe's Criminal Evidence* ( *p.* 13), the rule of Lord Hale is cited and approved, as also 4 *Blackstone's Commentaries* ( *p.* 358) and 2 *Leach* ( *p.* 571). In *Regina* v. *Hopkins* ( 8 *Carr. & Payne,* 591), the jury were directed by Lord Abinger to acquit the prisoner, because the body of her child was not found, nor the death otherwise proved by direct evidence. He says: " With respect to the child, which really was the child of the prisoner, she cannot, by law, be called upon either to account for it or to say where it is; unless there be evidence to show that her child is actually dead." In 2 *Leach* ( *p.* 571), is found a very strong case. The mother and reputed father of a bastard child were observed to take it to the margin of the dock in Liverpool, and after stripping it to throw it into the dock. The body of the infant was not afterwards seen, but as the tide of the sea flowed and reflowed into and out of the dock, the learned judge who tried the father and mother for the murder of their child, observed that it was possible the tide might have carried out the living infant, and the prisoners were acquitted. ( *Ros. Cr. Ev.,* 13.) In 1 *Parker's Criminal Reports* ( *p.* 609, *Videtto's case* ), Walworth, J., says : " One rule, however, which never ought to be departed from, is that no one should be convicted of murder upon circumstantial evidence, unless the body of the person supposed to have been murdered has been found, or there be other clear and irresistible proof that such person is actually

dead. In 2 *Parker's Criminal Reports* (*p.* 14, *Porter's case of blasphemy*), the same judge held that the offence could not be established by evidence of the defendant's confessions made out of court; but that it must be proved that the crime had been committed by persons who heard it. Many other cases might be cited, but the foregoing are deemed sufficient. It is believed that modern writers have in no respect called in question the safe old rule of Lord Hale, but that, since its announcement, it has been universally approved by judges and publicists. It is therefore submitted, that his honor who tried this case fell into a fatal error, and that the verdict should be set aside and a new trial ordered.

*Daniel S. Dickinson,* for the people.

To establish the *corpus delicti* in this case, and the guilt of the prisoner, proof of two facts was necessary: First. The death of the prisoner's infant daughter; Second. That she died by his felonious act. His Honor, Justice Mason, held at the circuit that these facts, and each of them, might be established by circumstantial evidence, as follows: First. The first branch, " by presumptive evidence of the most cogent and irresistible kind, so that it is established by circumstances proved so strong as to produce the full certainty of death." Second. The second branch, " the government are required, before they can claim a conviction, to prove by their evidence the guilt of the prisoner beyond any rational doubt."

To these rulings the counsel for the prisoner excepted, and the only question to be discussed is whether they were correct or erroneous.

I. The whole course of authority, ancient and modern, elementary and adjudged, shows that a murder, like any other crime, may be proved by circumstantial evidence so strong and convincing in its character as to produce full certainty. (1 *Stark. Ev.*, 573–578; 3 *Greenl. Ev.*, § 30; 1 *id.*,

§ 13; 3 *Cow. & Hill's Notes, part 1st*, 470–472, *notes* 286–288, *new ed.; id.*, 562–564, *note* 305; *Whart. Am. Cr. Law*, 284–286; 1 *Arch. Cr. Pr. and Pl.*, 135; *Barb. Cr. L.*, 455, *2d ed.; Jacobson's case, U. S. C. C., per* Livingston, judge, 2 *City Hall Recorder*, 143; *Whart. Am. L. of Hom.*, 316, 317; *Burr. Cir. Ev.*, 678–680, *and cases there cited, id.*, 70–117; *United States* v. *Johnson, Wash. C. C. R.*, 372; *State* v. *Turner*, 1 *Wright, Ohio*, 20; *U. S. Cr. Dig.*, 321; *United States* v. *Gilbert*, 2 *Sumn. C. C. R.*, 27; *Commonwealth* v. *Webster*, 5 *Cush.*, 296; *People* v. *Green*, 1 *Park. Cr. R.*, 22; *People* v. *Videtto, id.*, 603.) The dictum of Lord Hale (2 *Hale's Pl. Cr.*, 290) was merely advisory, and though true as a general rule, is not, to the extent it purports, recognized as authority by modern courts.

II. The only principle upon which circumstantial evidence can be rejected as to the death, must be, to guard with greater certainty against, first, mistake; second, perjury. But direct evidence is subject to the same defects. The witness is liable to be mistaken in the person who commits the act, in the act committed, in the person upon whom it was committed and in the effect produced, whether it was a mere blow or a fatal stab. And if perjury is to be feared, it is more dangerous in direct than in circumstantial evidence.

III. Identifying the body is still more liable to mistake, and direct evidence, in many cases, is more unsatisfactory than a chain of strong consistent circumstances.

The counsel cited numerous cases where direct evidence had been relied on to identify remains, showing its uncertainty and error.

MASON, J.— The only question presented by the prisoner's counsel upon the bill of exceptions in this case is, whether, upon the trial of an indictment for murder, the *corpus delicti* can be proved by any other than direct evidence. The question is one of the highest importance, and I have

examined it with the most anxious desire to arrive at a just conclusion and a correct determination of the question, and have bestowed upon it the most careful and deliberate consideration; and the result is a firm conviction that there is nothing in the results of experience, or in the nature and character of circumstantial evidence, which forbids the *corpus delicti* being proved and· established by indirect evidence, any more than there is the guilt of the prisoner, or any other fact in the case. There is no more insecurity in the sanctions given to circumstantial evidence, as administered at the present day in the courts of England and this country, than there is in direct evidence; and every attempt which has been made to assail circumstantial evidence from the results of experience has done no more than to prove that it necessarily partakes of the infirmities incident to all human testimony. Every consideration which has been argued against it on this ground has only tended to detract from the credibility of human testimony generally, and has shown that the infallibility of human testimony applies to circumstantial only in common with other evidence. If the annals of the judicial history of England, from the time of William the Conqueror to the present day, could be put into a volume, it would show more convictions of innocent persons in capital cases by direct evidence, the results of fraud and· perjury and honest mistake, than those upon circumstantial evidence alone. There is little doubt that if the catalogue of victims be confined to perjured witnesses alone, the result would show a greater number than can be imputed to the account of circumstantial evidence; and yet honest mistake and fallibility in direct and positive proof, would remain to claim its share.

The testimony of the senses cannot be implicitly relied on, even where the veracity of the witness is above all suspicion, and consequently, lamentable mistakes have occurred in direct and positive proof as to the identity of the prisoner. Sir Thomas Damont, an eminent· English barrister, a gentle-

man of acute mind and strong understanding, swore positively to the identity of two men whom he charged with robbing him in open day-light. But it was proved by the most conclusive evidence that the men on trial were, at the time of the robbery, at so remote a distance from the spot that the thing was impossible. The men were acquitted, and some time afterwards the robbers were taken, and the articles stolen found upon them. Sir Thomas, on seeing these men, candidly acknowledged his mistake, and, it is said, gave a recompense to the men who so narrowly escaped conviction. (*Rex* v. *Wood and Brown*, 28 *State Trials*, 819 ; *Wills on Cir. Ev.*, 31, 47, 48.) The case of *Rex* v. *Clinch and McAckley* (3 *Par. & Fon.*, 144), where the prisoners were convicted at the Old Bailey Sessions, in 1797, of the murder of one Frier, and executed. The identity of the prisoners was positively sworn to by a lady who was in company with the deceased at the time of the robbery and murder. It turned out afterwards that she was mistaken in the persons. (*Wills on Cir. Ev.*, 110.) An equally fatal mistake was made in the conviction of Robinson, at the Old Bailey, in July, 1824, upon direct and positive proof. (*Rex* v. *Robinson, Sess. Papers*, 1824 ; *Wills on Cir. Ev.*, 110.) A similar mistake was made by another prosecutor, a few months before the last mentioned case, where a young man was tried for highway robbery, and the prosecutor swore positively that the prisoner was the man who robbed him of his watch. (*Wills on Cir. Ev.*, 111.) *Grow's case* was a conviction for murder by an honest mistake in the witnesses of personal identity. They mistook Grow for Geddely, the real criminal. The remarkable case of Hoag, tried in the city of New-York, for bigamy, forcibly illustrates how easy it is to be mistaken upon a question of personal identity. (5 *C. H. Rec.*, 124.) Cases of this description might be greatly multiplied, but they would only serve to establish the fallibility of even direct and positive proof. The evidences of the identification of the dead body, in many

of the cases referred to by the counsel for the people, upon the argument of this case, although classed under the head of direct evidence, are less satisfactory proof of the *corpus delicti* than the evidence in the case at bar furnishes. In the case of *Eugene Aram*, where the skeleton was found in a cave thirteen years after the murder, the proof of the identity of the body as that of Clarke was very faint, and but for the strong circumstantial evidence, a conviction could never have been justified. Charles I., after being much disfigured, was identified by a resemblance to the head upon the coins issued during his reign. The Marchioness of Salisbury, found among the ruins of Hatfield House, was identified by gold appendages to the artificial teeth. In the case of *Mary Martin*, the identification was by missing teeth. In the case of *Clows*, the body was identified twenty-three years after the murder by the peculiarity of the teeth. In the recent case of *Dr. Webster*, in our own country, the identification of the body consisted in the evidence of a dentist as to the identity of the artificial teeth. There is little use in going over the cases of this description. The evidence of identity in very many of these and similar cases, which might be greatly multiplied, are, although classed under the head of direct evidence, far less satisfactory proof to establish the *corpus delicti* than many cases which rest entirely upon circumstantial evidence. It is no reason, therefore, for rejecting circumstantial evidence that a few cases can be found in the course of, perhaps as many centuries, where innocent men have been convicted upon this species of evidence, for the results of experience have demonstrated that the same accusation, with equal if not greater force, may be brought against direct evidence. It was well and beautifully said by Park, J., in *Rex* v. *Thurtell*, tried for the murder of Weare, at the Hartford assizes, in January, 1824, that " the Eye of Omniscience can alone see the truth in all cases; circumstantial evidence is there out of the question ; but clothed as we are with the infir-

mities of human nature, how are we to get at the truth without a concatenation of circumstances? Though, in human judicature, imperfect as it must necessarily be, it sometimes happens, perhaps in the course of one hundred years, that in a few solitary instances, owing to the minute and curious circumstances which sometimes envelope human transactions, error has been committed from a reliance on circumstantial evidence; yet this species of evidence, in the opinion of all those who are most conversant with the administration of justice, and most skilled in judicial proceedings, is much more satisfactory than the testimony of a single individual who has seen the fact committed." (1 *Cow. & Hill's notes*, 393.)

It was said, by Washington, J., in *The United States* v. *Johns* (1 *Wash. C. C. R.*, 372), that circumstantial evidence is sufficient, and is often more persuasive than the positive evidence of a witness who may be mistaken, whereas a concatenation and a fitness of many circumstances, made out by different witnesses, can seldom be mistaken or fail to elicit the truth." It was said, by Livingston, J., that "the rule, even in a capital case, is, that should the circumstances be sufficient to convince the mind and remove every rational doubt, the jury is bound to place as much reliance on such circumstances as on direct and positive proof, for facts and circumstances cannot lie." (*Jacobson's case*, 2 *C. H. Rec.*, 143; 1 *Cow. & Hill's Notes*, 308.) Burnett says: " *Circumstances are inflexible proofs.*" (*Burn. Com. L. Scotland*, 523.) Paley says: "Circumstances cannot lie." (*Prin. Mor. & Pol. Phil.*, book 6, *ch.* 9.) Burke, the distinguished statesman and orator, has said that " when circumstantial proof is in its greatest perfection, that is, when it is most abundant in circumstances, it is much superior to positive proof." (*2 Burke's Works*, 624.) Paley has declared, and with more caution, that "a concurrence of well authenticated circumstances composes a stronger ground of assurance than positive testimony, unconfirmed by circumstances, usually

affords." (*Prin. Mor. & Pol. Phil.*, *book* 6, *ch.* 9.) It was said, by Baron Legge, upon the trial of Mary Blandy for murder, that where "a violent presumption necessarily arises from the circumstances, they are more convincing and satisfactory than any other kind of evidence, because facts cannot lie." (28 *State Trials*, 1187.) Mr. Justice Buller stated to the jury, in his charge in the trial of John Donellan for murder, that "a presumption which necessarily arises from circumstances is very often more convincing and satisfactory than any other kind of evidence, because it is not within the reach and compass of human abilities to invent a train of circumstances which shall be so connected together as to amount to a proof of guilt without affording opportunities of contradicting a great part if not all of those circumstances." (*Gurney's report of trial.*) The opinions of judges of similar import might be multiplied to almost any extent, but the character and force of circumstantial evidence is so well defined and recognized by all the elementary writers upon evidence that it becomes unnecessary to pursue it. Starkie, in speaking of circumstantial evidence, says: "It is, in its own nature capable of producing the highest degree of moral certainty." (3 *Stark. Ev.*, 479, 480.) The nature and character of circumstantial evidence are as well elucidated and described by Wills, in his admirable book on circumstantial evidence, as in any author which has fallen under my observation. He maintains that circumstantial evidence is capable of producing an equal degree of moral certainty with direct evidence; and Burrill, in his most excellent treatise on circumstantial evidence, maintains the same claim for it In short, there is not a writer of any respectability upon the principles of evidence but what admits that circumstantial evidence has the inherent capacity to produce moral certainty in its results. It is a principle of circumstantial evidence that it is never permitted to rise to the dignity of proof until it does produce moral certainty. It is correctly said by Mills that a presumption which neces-

sarily arises from circumstances cannot admit of dispute and requires no corroboration. He adds: "If evidence be so strong as necessarily to produce certainty and conviction, it matters not by *what kind* of evidence the effect is produced, and the intensity of the proof must be precisely the same whether the evidence be direct or circumstantial. It is not," he adds, "intended to deny that circumstantial evidence affords a safe and satisfactory ground of assurance and belief; nor that, in many individual instances, it may be superior in proving power to other individual cases of proof by direct evidence." ( *Wills Cir. Ev.*, 29, 45. ) It was said by Lord Erskine, with the strictest philosophical truth, in the *Banbury Peerage case*, that "proof is nothing more than a presumption of the highest order." ( *Id.*, 48. ) It is equally so, whether the evidence be direct or circumstantial. If a witness swears directly to a fact, as a general rule, we regard the fact as proved, because we presume the witness has told the truth ; yet it is but a presumption after all. Having considered thus far the nature and character of circumstantial evidence, let us inquire whether it has not sufficient proving power to establish the *corpus delicti* in a charge of murder.

Lord Hale has often been referred to as authority against the rule, and in some instances has been followed as authority, denying the admissibility and competency of such evidence to establish the *corpus delicti* in such a case. Lord Hale said: "I would never convict any person of murder or manslaughter unless the fact were proved to be done, or at least the dead body found, for the sake of two cases," which he states, of wrong convictions, where the body was not produced or found and identified. (2 *Hale*, 290; 2 *Stark. Ev.*, 513.)

Now the only reason assigned by Lord Hale against the competency of this species of evidence, if it can be regarded an opinion against its competency, was that, in two instances, convictions had been had upon circumstantial evidence to establish the *corpus delicti*, when it turned out afterward

that the persons were innocent. . This is no argument for rejecting this species of evidence, for the same accusation can be brought against the proof of the guilt of the prisoner by circumstantial evidence, where the *corpus delicti* has been clearly established by direct evidence, and the same charge can be brought against direct evidence, as we have shown. This remark of Lord Hale, although it has been often quoted by judges, and has found its way into the elementary books upon evidence and of publicists upon criminal law, yet it has not been generally regarded as authority, but at most as merely advisory, and the rule as stated by him is now generally repudiated as unsound. It is stated by Burrill, in his valuable *Treatise on Circumstantial Evidence*, that " the death may be inferred from such strong and unequivocal circumstances as renders it morally certain, and leaves no ground for reasonable doubt." (*Burr. Cir. Ev.*, 680.) It is said by Wills, in his most estimable *Essay on Circumstantial Evidence*, that it is a fundamental and inflexible rule of legal procedure, and of universal obligation, to require satisfactory proof of the *corpus delicti*, either by direct evidence or by cogent and irresistible grounds of presumption. (*Wills Cir. Ev.*, 156, 178.) He says again (*p.* 185), after quoting the remark of Lord Hale, " that to require the discovery of the body, in all cases, would be unreasonable, and lead to absurdity and injustice, and is, indeed, frequently rendered impossible by the act of the offender himself. The fact of death, therefore," he adds, " may be inferred from such strong and unequivocal circumstances of presumption as render it morally certain and leave no ground of reasonable doubt." (*Id.*, 163–185, 3*d Lond. ed.*) Greenleaf adopts the rule of Wills. He says that even in the case of homicide, though ordinarily there ought to be the testimony of persons who have seen and identified the body, yet this is not indispensably necessary in cases where the proof of death is so strong and intense as to produce the full assurance of moral certainty. (3 *Greenl. Ev.*, § 30.) He cites the remark of

The People *v.* Rulloff.

Lord Hale (*id.,* 121, § 131), and regards it as only advisory, and repudiates it as a rule. Starkie (*vol.* 1, 511, 6*th Am. ed.*) quotes Lord Hale with approbation, and declares the rule, in unqualified terms, to be that the *corpus delicti* can only be proved by direct evidence of the fact, or by discovery and inspection of the dead body. He has, however, referred to the subject again (2 *id.,* 513), and corrected himself in the employment of the following language: "It has been laid down by Lord Hale, as a rule of prudence in cases of murder, that, to warrant a conviction, proof should be given of the death by evidence of the fact or the actual finding of the dead body." But he adds, "although it be certain that no conviction ought to take place unless there is the most full and decisive evidence as to the death, yet it seems that actual proof of the finding and identifying of the body is not absolutely essential." And it is evident that to lay down a strict rule "to that extent might be productive of the most horrible consequences." (2 *Stark. Ev.,* 513, 6*th Am. ed.*) It is stated in *Russell on Crimes,* that it has been holden as a rule that no person should be convicted of murder unless the body of the deceased has been found; and then, after quoting the language of Lord Hale, he adds: "But this rule, it seems, must be taken with some qualifications; and circumstances may be sufficiently strong to show the fact of murder though the body has never been found." (1 *Russ. on Cr.,* 567.) It is said by Chitty, in his *Criminal Law,* that "It is said to be a good general rule that no man should be found guilty of murder unless the body of the deceased is found, because instances have arisen of persons being executed for murdering others who have afterward been found to be alive. But this rule must be taken rather as a caution than as a maxim to be universally observed, for it would be easy, in many instances, so to conceal the body as to prevent it from being discovered." (1 *Chitty Cr. L.,* 738; 2 *Arch. Cr. Pl.,* 208, *Waterman's ed.*) The following authorities will be found fully to establish the rule that where the discovery of

the body cannot be had, the *corpus delicti* may be proved by circumstantial evidence, where the facts and circumstances are so strong as to render it morally certain and leave no ground for reasonable doubt. (*Whart. Am. L. of Homicide*, -316, 317 ; *Burr. Cir. Ev.*, 678–680, 70–117 ; 3 *Cow. & Hill's Notes, part* 1, 470–472, 562–564, *new ed; Whart. Am. Cr. L.*, 284–286 ; 2 *Arch. Cr. Pl. and Pr.*, 134, 135, *Waterman's ed.; Barb. Cr. L.*, 455, 2d *ed*; *United States* v. *Johns*, 1 *Wash. C. C. R.*, 372 ; *State* v. *Frier*, 1 *Wright's Ohio R.*, 20 ; *United States* v. *Gilbert*, 2 *Sumn. C. C. R.*, 27 ; *Commonwealth* v. *Webster*, 5 *Cush.*, 296 ; *Wills Cir. Ev.*, 185, 195.) In the cases of *The United States* v. *Gilbert* (*supra*), Justice Story, having this rule of Lord Hale pressed upon him, said : " The proposition cannot be admitted as correct, in point of common reason or of law, unless courts of justice are to establish a positive rule to secure persons from punishment who may be guilty of the most flagitious crimes. In the case of murders committed on the high seas the body is rarely, if ever found, and a more complete encouragement and protection for the worst offences of this sort could not be invented than a rule of this strictness. It would amount to universal condonation of all murders committed on the high seas." I assume, therefore, that the *corpus delicti*, as well as the guilt of the prisoner, may be proved by circumstantial evidence. It is undoubtedly true, as a general rule, that the dead body ought to be found and identified ; but, like all other general rules, it has its exceptions. It becomes important, then, to inquire what are the exceptions to this general rule. There is no particular class of cases that can be said in law to form an exception. The application of the familiar and well settled rule in regard to allowing circumstantial evidence to prove a fact, is the only one that can be recognized in such a case; that rule is that circumstantial evidence can never be resorted to except where direct evidence is unattainable. (*Wills Cir. Ev.*, 47.) Starkie says, circumstantial evidence ought in no case to be relied on where direct or positive

evidence which might have been brought by the prosecutor is willfully withheld. (1 *Stark. Ev.*, 515; *Wills Cir. Ev.*, 47.) It is not, then, allowed to prevail to the conviction of an offender simply because it is politic, but because it is in its own nature capable of producing the highest degree of moral certainty in its application. ( 1 *Stark. Ev.*, 494, 495.) The mistaken policy which led some of the writers on the civil and common law to modify their rules of evidence according to proof incident to particular crimes, and to adopt the execrable maxim that the more atrocious was the offence the slighter was the proof necessary, has no place in the wise common law principles of evidence as administered in England and this country. (*Wills Cir. Ev.*, 157, 178.) That no consideration of supposed expediency is permitted to supersede the immutable obligations of justice is a wholesome maxim of our common law rules of evidence. (*Id.*, 173.) Many of the continental codes of Europe prescribe imperative formulæ descriptive of the kind and of the amount of evidence necessary to constitute legal proof. (*Id.*, 211, 236.) But this doctrine is wholly repudiated by the common law principles of evidence. It does not attempt to fix with arithmetical exactness a common standard of proof, which shall influence with unvarying intensity and affect the minds of all men alike. (*Id.*, 236.) The common law principle of evidence regards such rules not merely as harmless and superfluous, but as positively pernicious and dangerous to the cause of truth ; and while they operate as snares for the conscience of the judge, they are unnecessary for the protection of the innocent, and effective only for the impunity of the guilty. (*Id.*, 236, 237.) In strict accordance with these principles, Mr. Starkie, in discussing the principles of circumstantial evidence, says : " What circumstances will amount to proof can never be matter of general definition. The legal test is the sufficiency of the evidence to satisfy the understanding and conscience of the jury. On the one hand, absolute metaphysical and demonstrative certainty is not

essential to proof by circumstances. It is sufficient if they produce moral certainty to the exclusion of every reasonable doubt." (1 *Stark. Ev.*, 514; 3 *id.*, 514; 1 *Cow. & Hill's Notes*, 308.) Greenleaf says it is obvious that upon this point no precise rule can be laid down, except that the evidence ought to be strong and cogent. (3 *Greenl. Ev.*, 32, § 30.) The doctrine is affirmed by Wills in the strongest terms. (*Wills Cir. Ev.*, 21, 26, 36, 41, 42.) In the case at bar there was no direct evidence of the *corpus delicti*, and as it was most evident that none could be adduced in the case, I am of opinion, for the reasons above stated, that I was right in saying to the jury that the *corpus delicti* might be proved by circumstantial evidence, when the evidence is so strong and intense as to produce the full certainty of death, or, in other words, that the death might be inferred from such strong and unequivocal circumstances as render it morally certain and leave no ground for reasonable doubt. I cautioned the jury that before they could find this issue against the prisoner they must be satisfied from the evidence in the case that it was established by presumptive evidence of the most cogent and irresistible kind; that it was established by circumstances proved so strong and intense as to produce the full certainty of death. Under this charge the jury responded in a verdict of guilty. It was an impartial verdict upon the evidence in the case, and accorded with my own convictions of the case, and entertaining the most deliberate opinion that no principle of law was violated upon the trial, and that no injustice was done the prisoner in the verdict of the jury, I am of opinion that a new trial should be denied.

GRAY, J. The only question here presented is as to the sufficiency of circumstantial evidence to establish the criminal act charged in the indictment. It is stated as a rule, by some elementary writers of high authority upon questions of evidence, that however strong or numerous the circum-

stances may be to establish a fact that a murder has been committed, they avail nothing unless the death be first distinctly proved by inspection of the body. ( 4 *Bl. Com.*, 359 ; *Stark. Ev.*, 3d ed., 509.)

This rule originated with Sir Matthew Hale, who said he would never convict any person of murder or manslaughter unless the fact were proved to be done, or at least the body found dead, for the sake of two cases. ( 2 *Hale's P. C.*, 290.) I have examined those cases, and although there is much in them calculated to induce courts to caution jurors to consider with the greatest care and scrutiny the evidence submitted for their consideration, to keep in mind the legal presumption of innocence and give to the accused the benefit of every reasonable doubt, yet I am not satisfied that they warrant a court in declaring that they will not carry into execution the verdict of a jury founded upon evidence, to the admissibility of which there is no possible objection, and which comes fully up to the legal test of proof in every other case and upon every other question that can arise, however highly penal the consequences may be. In one of the cases referred to by Lord Hale, two things occurred out of the ordinary course of legal proceedings, without which a conviction would not have ensued. It was the well known case of an uncle charged with murdering his niece; he was admonished, by the justices before whom he was examined, to find out the child by the next assizes; not being able to comply with judicial admonition he feared the consequence, and to avoid it brought another child like her in person and years, having appareled her like the true child. The deception was discovered, and upon the presumption arising from the child's absence and the fraudulent substitution, he was convicted and executed. It was afterwards discovered that the missing child was living,

The melancholy result in that case may well be attributed to the extraordinary demeanor of the justices and the

accused, and not to any defect in the rule of evidence adopted.

The other is a case, given by Lord Hale, of a man being convicted of the murder of another. The latter had been a long time missing, and was supposed to have been murdered by the accused and consumed by him to ashes in an oven. The accused was convicted and executed, and the latter returned within a year.

It is enough to say of this case, that under the rule now sought to be enforced by the prosecution, properly administered and the accused reasonably well defended, no such conviction could at this age be had. That there have been other cases of conviction where the party supposed to be murdered was, at the time of the conviction, alive, is undoubtedly true.

We are therefore called upon, on account of there having been once, perhaps in a century, such an instance, to hold that no conviction can be had unless the act of killing be proved by the evidence of one or more who saw it or the dead body be found. Should this be done, we should, for the same reason, where the dead body is found, hold that the crime of killing and the discovery of the author could not be established by circumstantial evidence. The danger in the latter case is fully equal, if not greater, than in the former, and in the latter case a two-fold evil would be almost necessarily the result, viz., "the escape of the guilty and the punishment of the innocent." Past experience has shown that very many instances have occurred in which honest witnesses have testified positively to a fact which subsequent developments have shown not to have existed. Verdicts have been the result of evidence given by perjured witnesses. In either case, we do not know whether the witness speaks the truth, but presume, from the reasonableness of his statement, his deportment upon the stand, and the fact that he is not contradicted, or in any respect impeached, that he has testified truly, and act accordingly.

The People *v.* Rulloff.

Although circumstantial evidence may technically, in some respects be regarded as inferior or secondary in its character, it is so only when it appears that direct evidence is withheld, and then only for the purpose of avoiding the suspicion that would otherwise rest upon it from the mere circumstance that attainable, direct evidence is withheld. It has therefore sometimes been held that direct evidence should first be produced; both are certainly more conclusive than either. Nevertheless, such evidence is not in any sense inferior to direct evidence; many able jurists have held that a combination of circumstances, so connected with each other as to form a chain of evidentiary facts, is more convincing and less liable to suspicion than what is ordinarily termed direct evidence.

To secure safety in the administration of justice, care is taken, in proportion as the controversy rises in importance, to guard against mistakes and injustice. In criminal trials, the interest at stake being greater, the law has justly thrown around the accused guards against erroneous conclusions to be drawn from evidence, whether direct or circumstantial, which renders it necessary that a higher degree of certainty should be arrived at than in civil cases. No possible objection can be sustained to the admissibility of circumstantial evidence; no one, upon judicial authority, doubts its competency when a death has occurred, to prove not only that the person was killed without authority of law, but to identify the murderer.

Our limited intelligence alone, without the aid of wisdom derived from the experience of those by whom rules of evidence have been devised, affords abundant proof that no rules of evidence adapted to the wants of society by the human mind are infallible; differences of opinion are entertained as to whether direct or circumstantial evidence is the least liable to error. A learned commentator says, with great truth, that "each have their peculiar advantages and characteristic dangers"; to reject either under all circum-

stances as insufficient, would result in the clearest injustice. If fallible minds should reject all evidence not infallible, there would be an end to the administration of justice, civil or criminal.

Necessity has forced upon us rules of evidence, and the protection of civil life is the highest object of our penal laws, and that, to a great extent, is accomplished by a dread of punishment; and notwithstanding the consequences to the accused are incalculably serious, yet if the *corpus delicti* be established by circumstances which come up to the best of proof, so strong and intense as to convince the understanding and consciences of a jury of the full certainty of death, though the dead body be not found, I am unable to discover upon what principle of justice a court can refuse to pronounce judgment upon the verdict. (3 *Greenl. on Ev.*, 32, § 30.)

Mr. Wills, in his valuable treatise upon *Circumstantial Evidence*, says, that to require the production of the dead body in all cases would be unreasonable, and lead to absurdity and injustice; and that the death may be inferred from such strong and unquestionable circumstances of presumption as render it reasonably certain, and leave no ground for reasonable doubt. (*Wills on Cir. Ev.*, 2, 203.)

Were it not so, says Bentham, a murderer, to secure himself with impunity, would have no more to do but to consume or decompose the body by fire, by lime, or by any other known chemical menstrua, or to sink it in an unfathomable part of the sea. (3 *Benth. Jud. Ev.*, 243.) Justice Story, in the case of *The United States v. Gilbert and others* (2 *Sumn.*, 19, 27), said of the rule contended for by the counsel for the prisoner, " It certainly cannot be admitted as correct, in point of common reason or of law, unless courts of justice are to establish a positive rule to screen persons from punishment who may be guilty of the most flagitious crimes. In cases upon the high seas, the body is rarely if ever found, and a more complete encouragement

and protection for the worst of offences could not be invented than a rule of this strictness. It would amount to a universal condonation of all murders committed upon the high seas."

The defendant's child, at the time of his trial, had been missing over eleven years, under circumstances that fully justified the inference that he had put it to death, and sunk its body and that of its mother, in Cayuga lake. Its clothes with those of its mother, were pawned by him in Chicago, soon after the child and mother were missing, under the assumed name of James H. Revilee; he then said they had died on Illinois river, south of Chicago.

The party to whom they were pawned, not hearing from him, opened the trunk containing the clothes, and found in it cards inscribed, James H. Rulloff, and on a separate paper, these words, " Oh, that dreadful hour "; also a lock of hair labeled either Harriet's or Mary's hair, the witness thought Harriet's.

The strong force of circumstances against him pressed him to the proof of his assertion that his child had died in Illinois, or that it was seen after the time it was missing; he made no effort to do either, but reposed himself entirely upon the inability of the prosecution to produce the dead body of his child.

I see no ground for interfering with the verdict.

BALCOM, J. (Dissenting.) The defendant was convicted of the murder of his infant daughter, at a Circuit Court, held in the county of Tioga, in October, 1856. He now moves for a new trial upon, a bill of exceptions.

It is claimed on the part of the defendant that the judge who presided on the trial erred in refusing to instruct the jury that the defendant could not be convicted of murder, for the reason that there was no direct evidence of the death or murder of his infant daughter; and in charging that the

jury might infer, presume and find, without direct proof, the death and murder of the infant daughter.

The proof shows that the defendant's infant daughter and its mother disappeared very mysteriously from the defendant's residence, in Tompkins county, in June, 1845, and that neither of them has since been found or heard of, although the most diligent search and inquiry have been made for that purpose by the people of Tompkins county and the relatives of the absent daughter and mother, on the mother's side.

The defendant's conduct, before and at the time the daughter and its mother disappeared from his house, and subsequently thereto, was such as to create a very strong suspicion that they are both dead and that he murdered them; and from such conduct, and other facts and circumstances disclosed by the evidence in the case, the jury have found him guilty of the crime of murdering his daughter, for which only he was tried.

The evidence is such that it is barely possible, though highly improbable, that the defendant's daughter is still alive. It is, however, so strong against the defendant on every point which it was necessary for the people to establish to show him guilty, that if a conviction for murder should be allowed in any case without certain evidence that the person supposed to be murdered is dead, we ought not to disturb the finding of the jury that he is guilty.

Should a conviction for murder be permitted in any case without direct and certain evidence that the person is dead whom it is supposed has been murdered, is the only question presented for our consideration in this case.

It is settled, both upon principle and authority, that the body of the murdered person need not always be found to authorize a conviction of the accused. Proof that the prisoner threw a person overboard from a vessel at sea, under such circumstances that it would be impossible for him to escape drowning, has been held sufficient evidence of the

death of the person so thrown overboard to warrant the conviction of the prisoner without finding the dead body. So proof that the prisoner had cast a person into a blazing furnace, from which he could not escape, the heat thereof being sufficient to entirely consume the body, would render it unnecessary for the prosecutor to give evidence of the finding of the body of the person thus destroyed. The evidence in such cases being direct and certain that the absent or missing person is dead, establishes the basis of the *corpus delicti;* and then whether the throwing of the person into the sea or casting him into a blazing furnace was murder or manslaughter, or done in self-defence, may be inferred from circumstances.

The rule laid down by Lord Hale is, that he " would never convict any person of murder or manslaughter unless the fact be proved to be done, or at least the body found dead," and judges have seldom violated this rule without committing judicial murder. It is not to be denied that innocent persons have been convicted of murder when the bodies of the murdered persons were found; but this fact should admonish us against relaxing Lord Hale's rule, instead of inducing us to sustain a conviction where, conceding that all the witnesses whose testimony is relied upon to establish the death of the absent person supposed to be murdered have told the truth, the whole truth, and nothing but the truth, and still it be possible that such person is living. I cannot concur in establishing the doctrine that human life may be taken for an alleged murder when the conclusion that a murder has been committed is drawn from the sudden and unaccountable disappearance and long continued absence of the person supposed to be murdered, or from other circumstances, which may be all true and yet no homicide have been committed by any person.

The evidence that the person whom it is alleged has been murdered is dead must be certain, and it must be such as to leave no room for the existence of any doubt whatever that

such person is dead, before a conviction for the murder of such person can safely be permitted. It will not do to presume from circumstances that an absent person is dead, and then build the further presumption upon it that such person has been murdered. Persons accused of murder must be proved to be guilty, by certain and reliable evidence, before they can be lawfully convicted. "The case must be such as to exclude to a moral certainty every other hypothesis but that of the guilt of the party accused." The case does not do this when there is the least uncertainty as to whether the person alleged to be murdered is dead. It is infinitely better for society that guilty persons should sometimes escape deserved punishment than for courts to establish a precedent that may be used to deprive innocent persons of life.

I cannot concur in sustaining the verdict in this case, because the evidence is such that it is possible that the defendant's daughter is yet living. That it is extremely improbable that she is living will not do. The evidence must be certain that she is dead before the defendant can be lawfully convicted.

I think the judge should have instructed the jury to acquit the defendant, and that for his refusal to do so the verdict should be set aside and a new trial granted to the defendant, to be had at the Tioga Circuit.

New trial denied.