WESTCHESTER OYER AND TERMINER. June, 1856. Before *S. B. Strong*, Justice of the Supreme Court, *W. H. Robertson*, County Judge, and the Justices of the Sessions.

## THE PEOPLE *v.* GEORGE WILSON.

The trial of a criminal case will be postponed on the application of the defendant, on the general affidavit of the absence of material witnesses, unless it is apparent that the application is made merely for the purpose of delay; in which case an affidavit will be required showing the nature of the defence intended to be sustained by the absent witnesses, that the court may judge of their materiality.

Where an application was made to postpone the trial of an indictment for murder, and it was claimed by the District Attorney, and was not controverted by the defence, that no living person except the prisoner was present at the alleged murder, and there was no pretence of an *alibi*, such general affidavit was held to be insufficient, and the prisoner was required to disclose what defence he expected to establish by the evidence of the absent witnesses.

Trials in criminal cases will not usually be postponed on account of the absence of witnesses to character.

Where an application was made to postpone the trial of an indictment for murder, to enable the defendant to procure witnesses to character, and the District Attorney, in opposing the motion, offered to admit the previously good general character of the prisoner, the motion was denied on the making of such admission.

On the trial of an indictment for murder, a juror was challenged by the District Attorney, for principal cause, on the allegation that he was opposed to capital punishments; on being sworn, the juror testified that he was opposed to the punishment of death, but said that if sworn as a juror on a trial for murder, and the evidence of guilt was clear, he should find the accused guilty; held, that the challenge was not sustained.

Where a challenge for principal cause, in such a case, had been made and tried, and the juror had been decided to be competent, it was held that the trial of the challenge might be opened, even after the juror had been sworn and taken his seat, and other jurors had been called, but before evidence in the cause had been taken, if it appeared that the juror had misunderstood the question put to him, and had given a wrong answer, and that the juror desired to make the correction and to say that he could not, under any circumstances, convict on a charge of murder; and where, on resuming the trial of a challenge under such circumstances, the juror repeated such correction, the challenge was held well taken, and the juror was set aside.

On a trial before the Oyer and Terminer, in the county of Westchester, it appeared that the alleged murder had been perpetrated on board a vessel

lying at anchor on Long Island Sound, about a quarter of a mile west of Hartt Island, and northerly of a line connecting the extreme points of Hartt and City Island; held, that the offence was committed within the county of Westchester.

Every part of the State of New-York is included within some one of the counties enumerated in the statute.

Where a body of water, in which the tide ebbs and flows, is situated between a range of islands and the main shore, and all are so near to each other that a person with the ordinary power of vision can see with the naked eye, from point to point, on every part of the connecting line, what is doing on each, it is within the county bounded upon the high seas, according to the rule which extends the jurisdiction of a county to a line running from one to the other of the *fauces terræ*.

When a brother-in-law of the deceased was called to show that, five months after the alleged murder, he saw and examined a body which was found, and was claimed to be the body of the deceased, and proceeded to testify to several points of resemblance between the body found and the person charged to have been murdered, and was then asked by the counsel for the prosecution, whether, in his opinion, it was the body of the person alleged to have been murdered, it was held, that the question was incompetent, and that it was the province of the jury, and not of the witness, to draw the conclusion from the points of resemblance, and to decide upon the identity of the body found, it appearing that the body found had been much decomposed and changed, and that all the remaining points of resemblance had been stated by the witness to the jury.

Ordinarily, there can be no conviction for murder until the body of the deceased is discovered; held, that the circumstances of this case formed no exception to the rule.

*E. Wells* (District Attorney), for the people.

*B. Bailey* and *F. Larkin,* for the prisoner.

On the 10th of June, 1856, two indictments were found and presented against the prisoner, one charging him with the murder of William Palmer, captain of a schooner called the Eudora, on board of that vessel, while lying at anchor between Hartt Island and City Island, in that part of Long Island Sound bordering on the county of Westchester, on the 24th of November, 1855; and the other charging him with the murder of Gilbert Pratt, the mate of that vessel, at the same time. The prisoner, on being arraigned, pleaded not

The People *v.* Wilson.

guilty, and demanded a trial.   The District Attorney proposed
to try the prisoner, upon the indictment for the murder of
Captain Palmer, on some day during the then session of the
court.   Mr. Bailey, for the prisoner, presented his affidavit,
stating that he had material and necessary witnesses in the
city of New-York, and others in the State of Pennsylvania,
whose attendance could not be procured during the present
session of the court, and moved that his trial should be
postponed until the next session of the court, in the follow-
ing September.   The District Attorney opposed the motion,
stating that the alleged crime had been perpetrated by the
prisoner (who was the colored cook on board the vessel),
during the night, when none but himself and the two mur-
dered men were present, and that the absent witnesses could
have no knowledge of the transaction.

STRONG, J.   It is usual to put off trials in criminal cases
on the general affidavit, unless it is apparent that the appli-
cation for postponement is merely for the purpose of delay;
then, and especially in cases where (as in trials for murder)
the ends of justice are best attained by prompt action, some-
thing more is required.   The affidavit should then state the
nature of the defence to be sustained by the absent witnesses,
in order that the court may judge of their materiality.   In
this case it seems, or at least it is inferable from the state-
ment of the District Attorney, which is not controverted, that
no living person but the prisoner was present (if indeed he
was the guilty party) at the scene of the alleged murders.
If so, the proposed witnesses can say nothing as to the trans-
action, and there is no pretence of an *alibi*.   It is, therefore,
so difficult to conjecture what material facts those witnesses
can disclose that it is reasonable and proper to refuse a post-
ponement, unless the prisoner discloses the nature of the
defence which he intends to establish by their evidence.

Mr. Bailey then said that it was intended to prove by the
absent witnesses that the prisoner had, up to the time of the
supposed murder, sustained a fair character.   The District

Attorney proposed to admit, for the purposes of the trial, that the prisoner's general character had been good.

STRONG, J.　Trials in criminal cases are not usually put off on account of the absence of witnesses to character. If that could be done there would be few, if any, trials for murder at the same court where the indictments are found, as the accused may suppose, or at least they could easily swear, that there were absent witnesses who could attest to their general good conduct. Besides, although the dread of perjury would be great with the innocent, yet, there would be little or none with those guilty of a more heinous offence. It is said by Chitty, and, I think, also in an opinion in the Court of King's Bench [the judge alluded to what was said by Laurence, J., in the case of *The King* v. *Jones,* 8 *East,* 31], that it is the constant practice of the Old Bailey not to put off trials on account of the absence of witnesses to character, lest there should be a failure in that prompt execution of justice so necessary to the intimidation of offenders. (1 *Chit. Cr. L.,* 402.) If, however, an admission from the public prosecutor had been necessary, it should, to make it of any avail, be unqualified.

The District Attorney made such admission.

STRONG, J.　The trial must, then, be set down for the twelfth instant.

On that day the trial commenced. After several of the jurors drawn had been challenged and set aside, and one had been sworn, one Ezra Haight was called, and was challenged for principal cause by the District Attorney, on the allegation that he was opposed to capital punishments, and could not, therefore, conscientiously convict any one on a charge of murder. The juror, on being sworn, testified that he was opposed to the punishment of death; but said, in answer to a question from the court, that he should, if sworn as a juror on a trial for murder, and the evidence of guilt was

clear, find the accused guilty. The court thereupon decided that the challenge had not been sustained, and the juror was thereupon sworn and took his seat. After another juror had been sworn, and several others had been set aside, Haight, who had been laboring under considerable trepidation, addressed the court, and said that he had misunderstood the question propounded to him, and given a wrong answer, and that he desired to correct himself, and say that he could not, under any circumstances, convict one on a charge for murder. The District Attorney thereupon moved that the juror should be set aside, which was opposed by the counsel for the prisoner, who said that in a case of so much importance they were bound to raise every objection which could benefit the accused.

STRONG, J. The position is a novel one, but it does not, I think, present an insurmountable difficulty. It was correctly held, in the case of *The People* v. *Damon* (13 *Wend.*, 351), that a juror, who, after he is sworn in chief and has taken his seat, is deemed to be incompetent to serve, may in the exercise of a sound discretion be set aside by the court at any time before evidence is given, and that this may be done even in a capital case, and as well for cause existing before as after the juror was sworn. In that case, however, the juror had not been previously challenged; whereas in that now before us a challenge had been interposed, and a trial has been had, and the juror has been found by the court to be competent. So long as that finding stands, the juror cannot be discharged; and yet it would be a mere mockery of justice to suffer the trial to proceed under such circumstances, and with such a juror. The maxim that "what necessity compels, it justifies," must, I think, apply in such a novel case. Our decision that the juror was competent must be vacated; the challenge to him must be opened; and the trial of it must be resumed. This was done; the juror repeated his last statement, and the

court pronounced the challenge true, and the juror was set aside.

The District Attorney stated in his opening address to the jury that the murder had been perpetrated on board of the Eudora, whilst she was lying at anchor about a quarter of a mile west of Hartt Island, and within (northward of) a line connecting the extreme points of Hartt and City Islands.

The counsel for the prisoner objected that, from the statement of the District Attorney, it was apparent that the scene of the alleged murder was upon Long Island Sound, and therefore beyond the jurisdiction of a state court sitting in the county of Westchester.

STRONG, J.  The boundary line of the State of New-York commences at Lyons Point, at the mouth of Byram's river, where it falls into Long Island Sound, and the last portion of it runs from Sandy Hook to the place of beginning (Lyons Point) in such manner as to include Staten Island and the islands of Meadon on the west side thereof, Shooters Island, Long Island, Gardiners Island, Fishers Island, Shelter Island, Plumb Island, Robins Islands, Ram Island, the Gull Islands and all the islands and waters of the Bay of New-York and within the described bounds.  (1 *R. S.*, 61–65.)  Whether a line is drawn directly from Sandy Hook to Lyons Point, or (what the description requires) a circuitous line, so as to include the islands, is adopted, that part of the sound where the vessel was lying is within this state.  By a statutory provision the state is divided into fifty-six counties. (3 *R. S.*, 1.)  By this I understand the entire state, so that every part of it, whether of land or water, is included in some county; such appears to have been the opinion of our Court of Appeals in a case reported by Mr. Selden.  [The judge alluded to the case of *Manley* v. *The People*, 3 *Seld.*, 295.]  In that case a majority of the judges, upon that principle, decided that where goods had been stolen on board of a

The People *v.* Wilson.

vessel in Long Island Sound, opposite the county of Suffolk, but *extra fauces terræ*, the offence was committed within that county. The dissenting judge admitted that a careful examination will show that every part of the state is included in some one of the counties enumerated in the statute, but he contended that no part of Long Island Sound, " except so much of it as Westchester includes," is embraced in either. The county of Westchester is bounded southerly by Long Island Sound, and includes " all the islands in the sound to the east of Frogs Neck and the northward of the main channel," of which Hartt and City Islands are two. As those islands are confessedly north of a straight line from Sandy Hook to Lyons Point and also of the main channel, they, and I think as clearly the waters between them, are in the county of Westchester. Besides, where, as in this case, a body of water in which the tide ebbs and flows is situated between a range of islands and the main shore, and all are so near to each other that a person with the ordinary power of vision can see with the naked eye from point to point on every part of the connecting line what is doing on each, I think that it is included within the county according to the *rationale* of the rule which extends the jurisdiction of the county to a line running from one to the other of the *fauces terræ*. I am satisfied that this court has the requisite jurisdiction, so are all of us, and the trial must proceed.

Neither of the bodies were found until the following May. Some time in that month a body was cast on the shore of Hunter's Island, within two miles of the place where the Eudora was anchored at the time of the alleged murder, during a severe storm, which was supposed to be that of Captain Palmer. The body was considerably decomposed, but there were several very significant marks upon it, among others, there was a considerable excoriation around one of the legs, which appeared to have been made by a tight ligature, which had probably been severed by sharp

stones.   The length of the body was within half an inch of
the height of the deceased.   In both the body of the living
Captain Palmer and that which was found there was an
unusual length of the face from the ear to the chin; a con-
siderable widening of the end of the little finger of the same
hand, and a ridge from the root to the end of the nail.   The
captain had impressed the initials of his name, with indelible
ink, on his arm and his leg.   The skin on the same part
of the same arm of the body found had been cut out, and a
part of the skin on the marked leg had also been removed,
but the letter "P" had been left and was plainly visible.   A
brother-in-law of the captain, who saw and examined the
body thrown on Hunter's Island, was examined as a witness,
and, after he had mentioned these various marks, he was asked
by the counsel for the prosecution whether, in his opinion, it
was the body of the deceased captain.   The counsel for the
prisoner objected to the question.

STRONG, J.   Ordinarily, the question of identity is one of
fact, and a witness may be asked whether he knows a
particular individual, and, if so, whether he is the person
indicated; but the question put to this witness is not the
ordinary one of identity.   It calls for an opinion relative to
a body which, if that of the deceased, had been submerged
in salt water for upwards of five months, and had undergone
many changes.   The witness can only state a conclusion
drawn from the points of resemblance mentioned by him.
The jury have heard his statements, and it is for them, and
not the witness, to decide whether the body was that of the
deceased captain.

The question must be rejected.

The vessel had been sunk shortly after the supposed
murder.   Four holes had been bored through her bow, and
the auger was inside of the vessel and near the holes.   The
pillows and mattresses of the captain and mate were satu-

The People *v.* Wilson.

rated with blood; many of their clothes had been thrust into a hole under the cabin. The prisoner had an axe which corresponded in shape and size with a cut in the skull of the body found on Hunter's Island. There was no evidence that any other person than the prisoner was on board of the vessel with the captain and mate on the evening of the murder. The prisoner left the vessel in a sinking condition, about eight o'clock on the following evening, in a long boat, and was arrested when near the shore of City Island. On stripping him, the captors found the captain's pocket-book, containing about $50, in one of the prisoner's boots, and they also found upon his person the mate's watch and pencil case, and some other articles of the deceased persons. The prisoner said that they had gone ashore the day before, but gave no other account of what had occurred on board the vessel.

In the several opinions expressed by the presiding justice the other members of the court concurred.

STRONG, J., in his charge to the jury, after recapitulating the evidence, and stating several rules of law applicable to the case, said that ordinarily there could be no conviction for murder until the body of the deceased was discovered. That there were several exceptions to the rule, however, as where the murder has been on the high seas at a great distance from the shore, and the body had been thrown overboard, or where the body had been entirely consumed by fire, or so far that it was impossible to identify it. But in the present case, the scene of the supposed tragedy was near the shore, and there was strong reason to suppose that, if a murder had been committed, the body of the deceased would be discovered. The exception to the rule is therefore inapplicable, and the jury must be satisfied that the body discovered on Hunters Island was that of the murdered captain, before they could convict the prisoner.

The trial was concluded at one o'clock in the morning of the fourteenth of June, at which hour the jury found the prisoner guilty. He was sentenced to be hung on the twenty-sixth of July following, and was accordingly executed on that day.

SUPREME COURT.   Delaware General Term, July, 1856.   *Gray,*
*Shankland* and *Mason,* Justices.