Argued 15 March, decided 28 April, rehearing denied 29 May, 1905.

## STATE *v.* WILLIAMS.

80 Pac. 655.

HOMICIDE—KIND OF PROOF OF CORPUS DELICTI REQUIRED.*
The death of the person alleged to have been killed is a necessary element in a prosecution for homicide, and must be established either by direct testimony or by circumstantial evidence of the most convincing nature. No general rule as to sufficiency can be stated, except that the best evidence obtainable should be produced, each case being dependent upon its particular circumstances.

From Wasco: W. L. BRADSHAW, Judge.

Norman Williams, informed against as Daniel Norman Williams, was convicted of murder, and appeals.     AFFIRMED.

For appellant there was a brief and an oral argument by *Mr. Henry E. McGinn.*

For the State there was a brief and an oral argument by *Mr. Andrew M. Crawford,* Attorney General, *Mr. Frank Menefee,* District Attorney, and *Mr. Fred W. Wilson.*

MR. JUSTICE BEAN delivered the opinion of the court.

This is an appeal from a judgment of death against the defendant for the murder of Alma Nesbitt. The only question is whether there was sufficient proof on the trial that she is dead. No evidence was offered by the defense. The facts, as shown by the prosecution, are that in May, 1899, Miss Nesbitt left her home and relatives in Iowa, and came, a stranger, to Oregon, with the defendant, to whom she was then engaged, with the avowed purpose of taking up a homestead adjoining the one belonging to him, with the understanding that they each should obtain title to their land, and then be married, thus consolidating the two homesteads. Arriving in Oregon about the last of May, Miss Nesbitt settled upon 160 acres of land adjoining that occupied by Williams in the mountains about 20 miles from Hood

*NOTE.—See extended collection of authorities in 68 L. R. A. 33-80, under the title, Proof of Corpus Delicti in Criminal Cases, with a note on the same subject in 91 Am. St. Rep. 24.     REPORTER.

River, and he built, or caused to be built, for her a house thereon. She made her filing on the 10th of June, and, after remaining on the place a short time, went away, probably to Portland, where she remained until the 25th of July, when she and Williams were married at Vancouver, in the State of Washington. This marriage was kept secret, and not made known to the neighbors of the contracting parties, or to Miss Nesbitt's relatives. Soon thereafter she went to The Dalles, and worked as a domestic, until early in October, when her mother, who was then about 69 years of age, came from Iowa to live with her daughter on her homestead. Williams met them at Hood River, and took them out to the place, where they remained during the winter, living a part of the time on Miss Nesbitt's homestead and a part on Williams', until the 7th of February, 1900, when the two women went to Portland for some purpose, and took rooms at the Winters lodging house on the east side. About the 6th of March, Williams, who was working at a sawmill five or six miles from his homestead, hired a man to drive his team for a few days, saying that he had important business at The Dalles. He went to Portland, however, and had an interview with Miss Nesbitt and her mother at the rooming house, concerning her homestead. The proprietor of the house, who overheard the conversation, or a part of it, testified that he could not recall the exact words used, but it was either that Williams wanted to buy Miss Nesbitt's homestead, or some one was about to jump it. At all events, the three parties left the rooming house together, probably as a result of this conversation, on Thursday, the 8th of March. They were next seen at Hood River soon after the arrival of the train from Portland on that day, where Williams applied to a livery stable for a span of horses and a wagon, to take, as he said, some passengers to his homestead that night. As the night was dark and stormy, and the roads heavy, the livery stable proprietor hesitated to send a team out for such a trip, and suggested to Williams that he wait until morning; but he said it was absolutely necessary for him to go that night, and arrangements were thereupon made for the team. Williams started with the two women in the wagon about 7.30 in the evening, declining to take a lantern or carriage lamp, although the

night was dark. He returned to Hood River about 8 o'clock next
morning, without the women, and neither of them has been seen
or heard of since. The team was covered with mud, and in
answer to questions from the owner Williams said that he arrived
at his homestead about 1 o'clock in the night and remained until
about 3. After paying the bill he went to another livery stable
in the town, hired a horse, and rode out to Leasure's place, about
six miles from his homestead, where he left the horse, with
directions to send it back next day by the mail carrier, and went
on to his homestead, and remained until the following Monday,
when he resumed the work at the sawmill in which he was
engaged before going to Portland. He continued such work
for a day or two, and then returned to his homestead, taking
his team and a load of sacked oats or grain.

On June 23d following he filed in the United States Land
Office an application to amend his homestead entry so as to
include a part of the land embraced in that of Miss Nesbitt,
accompanying it by what purported to be a relinquishment by her
of her homestead, dated the same day, the signature to which,
however, was forged by him. The land department, without
knowledge of this forgery, and supposing the paper to be genuine,
permitted him to amend his homestead entry, and he continued
to live on the claim until some time in the fall or winter of
1900-1901, when he left the neighborhood, and was soon there-
after living at Bellingham Bay, Wash., with a woman he claimed
to be his wife, and had with him a young woman whom he intro-
duced to his neighbors as Miss Nesbitt, but whom the testimony
shows to have been another person. From the time Miss Nesbitt
and her mother arrived in Oregon up to the time of their disap-
pearance they had been in the habit of writing regularly to
their relatives in Iowa and Nebraska as often as once or twice in
every week or 10 days. Their mysterious and unexplained dis-
appearance, as well as the cessation of these letters, naturally
created great uneasiness among their relatives, and speculation
by Williams' neighbors. Inquiry and search were thereupon
made to ascertain their whereabouts, if possible. As was natural,
inquiry was made of Williams. He made many inconsistent,
contradictory, and false statements in regard to the matter. To

[19—46 Or.]

one of the witnesses he said that he had received a letter from Miss Nesbitt after the time of her disappearance, and put his hand into his pocket as if to produce it, but suddenly discovered that he had left it in the pocket of another garment. To other witnesses he said that he did not know of her whereabouts, and that the last time he saw her or her mother was when he put them aboard the train at Hood River on the morning he returned the team to the livery stable, although the train passed that station two or three hours before his return to town. To others he said that the last time he saw either of the women was on the 28th of January, 1900, when they left the homestead with a man by the name of Edmunds or Edwards. To the United States District Attorney, after he was indicted for forging Miss Nesbitt's name to the homestead relinquishment, he produced what purported to be a clipping from a newspaper containing a notice of the marriage of a Miss Alma Nesbitt to a W. H. Edwards at North Yakima, Rev. Mr. Griggs officiating. The testimony of the county clerk and postmaster at North Yakima showed that there was no record at that place of such a marriage, and that no such persons as the alleged contracting parties or officiating clergyman were known in that community. In a letter written in August, 1900, by the defendant, in answer to one from Mrs. Swift, a sister of Miss Nesbitt, he intimated that she was immoral, and had clandestinely gone away with another man, and suggested that further search for her and her mother be discontinued; for "as long as we keep trying to find them they are bound to keep quiet, and I know now that there is nothing happened to them, so I shall spend no more money, or time either, for I know she has left me for good." In this same letter he inquired if there had not been trouble between Miss Nesbitt and her sister, saying that she and her mother had both told him that they would never write to Mrs. Swift again, or tell her anything. In the spring of 1901 he suggested to one of his neighbors, in a conversation concerning the disappearance of the two women, and the suspicion against him on that account, that "you and Doc Riggs can straighten this matter up for me if you will, and set everything right about it, and we could make everything

right. If you and Doc Riggs could say you saw me taking these women to town, that would settle this matter, and straighten it up for me."

The relatives of Miss Nesbitt and.her mother being unable to obtain any satisfactory information by correspondence as to their disappearance or whereabouts, Mr. George R. Nesbitt, a son and brother, came to Oregon in February, 1904, and went out to Williams' homestead to make a personal examination of the surroundings. After an investigation, he and his companion noticed a depression in the ground in a building used as a hen-house about 30 feet distant from the dwelling on the Williams claim. On digging they discovered an excavation about six feet long by three feet wide and about six feet deep, which had been filled up at some time. Upon throwing out the dirt they found in the bottom a lot of gunny sacks, which had been soaked with some liquid, and two tufts of hair about eight or ten inches long, one very fine and partly gray and the other black, matted together, as if clotted with blood. The gunny sacks and hair were examined by an expert chemist, who testified that the sacks had been saturated with human blood, and that the hair was human hair, and that the black hair had been removed from the scalp before death. Mr. Nesbitt identified the fine gray hair as that of his mother, and a woman who lived near the Williams homestead, and who saw much of the two women during the winter they lived on the claim, also testified that she had combed the old lady's hair many times, and believed it to have belonged to her. When Williams was asked to explain the matter of the excavation and the finding of the hair, he said that the excavation was formerly used for a water-closet, but that he had moved the closet and filled it up; that before doing so he had thrown into it some gunny sacks used as bedding for his mares when foaling that spring, and some bits of dogskin containing hair, which he had used as housing for his harness. These statements were shown to be false, not only by the testimony of the expert as to character of the blood on the gunny sacks and the hair, but by the testimony that one of the mares had her colt at a mill some six miles distant from his homestead, and the other after the water-closet had been moved and the excavation

filled up, if that had ever been done. No skin or hide of any kind was found in the hole or excavation, and the hair found therein was eight to ten inches long, so that it could hardly have been dog's hair, as claimed by the defendant; and, moreover, parties who were familiar with Williams' team and harness testified that they never knew of his using any dogskin in connection therewith. On March 14, 1900, about six days after the disappearance of Miss Nesbitt and her mother, a surveying party was at Williams' house for dinner. He was at that time engaged in building the chicken house in which the excavation was afterwards discovered. Covering the exact spot where the excavation was found was a pile of sacked grain, although it was thus exposed to the weather, and there was plenty of room in the shed adjoining his house for its storage. In the spring of 1900 Williams had some land cleared near his house. The brush from it was piled up and burned during the summer, and it is suggested that, becoming alarmed at the search that was being made for the missing women, he removed their bodies from the excavation, and burned them in the brush fire.

The rule at one time seems to have prevailed that a conviction for murder or manslaughter could not be sustained without direct proof of the killing, unless the body of the supposed victim had been found: 2 Hale, P. C. 290; Starkie, Evidence (10 ed.), *862; Wills, Circum. Ev. p. 206; 7 Am. & Eng. Enc. Law (2 ed.), 862. So strict was this rule observed that it is said that on a trial for murder by a mother and the reputed father of a bastard child, which the proof showed they stripped and threw into the harbor of a seaport town, the court directed an acquittal on the ground that, as the tide of the sea flowed and reflowed into and out of the harbor, it might possibly have carried out the living child: Garrow, arguendo, in *Hindmarsh's Case,* 2 Leach, C. C. 571. In another case a mother was indicted for the murder of her illegitimate child. It had been sent to a nurse's, where it remained for a time, when the prisoner took it away, stating an intention of going to her father's. She was seen with the child next day as late as 6 o'clock, going in the direction of her father's house. Between 8 and 9 o'clock she arrived at the house without the child. The body was never found, and the court directed an

acquittal: *Regina* v. *Hopkins,* 8 C. & P. 591. The cook of a schooner was indicted for the murder of the captain upon Long Island Sound and throwing his body overboard. Some months later a body floated upon the shore, which the prosecution claimed was shown to be that of the murdered man. The court charged the jury that, inasmuch as the supposed tragedy was near the shore, and there was strong reason to suppose that, if the murder had been committed, the body would be discovered, they must be satisfied that the body produced was that of the murdered captain before they could convict the prisoner: *People* v. *Wilson,* 3 Parker, Cr. R. 199, 207. In *Ruloff* v. *People,* 18 N. Y. 179, the defendant was indicted for the murder of his infant child, and circumstances pointed strongly to his guilt, but the court held that he could not be convicted, inasmuch as the body of the child had never been found. The opinions in this case in the supreme court (3 Parker, Cr. R. 401), where it was held that a conviction could be had without the production of the body, and those on appeal (18 N. Y. 179), reversing the judgment, contain an exhaustive consideration of the rule as to the proof of the corpus delicti under the decisions as they then stood. The doctrine of the cases requiring the production of the body of the person alleged to have been murdered is based upon the statement of Lord HALE in 2 Hale, P. C. 290, that "I would never convict any person of murder or manslaughter, unless the fact were proved to be done, or at least the body found dead." This statement was made at a time when a prisoner charged with a felony was not accorded the right to testify in his own behalf, the advantage of sworn witnesses, or the full aid of counsel; and Mr. Best thinks the statement too broad, and that the principle laid down must be taken with considerable limitations: Best, Evidence, § 441. And such language was afterwards stated by an English judge to have been by way of caution, rather than as laying down an absolute rule of law: *Regina* v. *Button,* Dearsly, C. C. 282, 284.

To require direct proof of the killing or the production of the body of the alleged victim in all cases of homicide would be manifestly unreasonable, and lead to absurdity and injustice; and it is believed that it is now clearly established by the authorities

that the fact of the death as well as the guilt of the defendant may be legally inferred from such strong and unequivocal circumstances as produce conviction to a moral certainty. Mr. Greenleaf says: "The proof of the charge in criminal causes involves the proof of two distinct propositions: First, that the act itself was done; and secondly, that it was done by the person charged, and by none other—in other words, proof of the corpus delicti and of the identity of the prisoner. It is seldom that either of these can be proved by direct testimony, and therefore the fact may lawfully be established by circumstantial evidence, provided it be satisfactory. Even in the case of homicide, though ordinarily there ought to be the testimony of persons who have seen and identified the body, yet this is not indispensably necessary in cases where the proof of the death is so strong and intense as to produce the full assurance of moral certainty. But it must not be forgotten that the books furnish deplorable cases of the conviction of innocent persons from the want of sufficiently certain proofs either of the corpus delicti or of the identity of the prisoner. It is obvious that on this point no precise rule can be laid down, except that the evidence 'ought to be strong and cogent,' and that innocence should be presumed until the case is proved against the prisoner, in all its material circumstances, beyond any reasonable doubt": 3 Greenleaf, Evidence (16 ed.), § 30. Mr. Kerr, in his work on Homicide, says: "The general rule, however, is that the corpus delicti, taken as a whole, may be shown by any evidence which satisfies the jury beyond a reasonable doubt, whether it be direct or circumstantial; but this is qualified and limited by the rule that the defendant's confession, taken alone and without corroborating proof of the corpus delicti, is not sufficient to support a conviction": Kerr, Homicide, § 493. Mr. Bishop, in commenting on the rule which formerly prevailed that there could be no conviction in homicide cases without direct proof of the death, says: "It is perceived that the only service it could ever do was to cover up those blunderings of justice which were apt to come to the public gaze; for if one was wrongly convicted through a blunder in any other part of the case than the corpus delicti, it would seldom become known; hence the like rule was not applied to such a case"; and

that "circumstantial evidence is admissible to the corpus delicti, the same as to the other parts of the case, and the jury may find a verdict of guilty solely upon it, equally in murder and in all other crimes": Bishop, New Crim. Proced. §§ 1056, 1057. Mr. Best, in his work on Evidence (section 446), remarks: "Whether it is competent, even in extreme cases, to prove the basis of the corpus delicti by presumptive evidence, has been questioned. But it seems a startling thing to proclaim to every murderer that, in order to secure immunity to himself, he has nothing to do but consume or decompose the body by fire, or lime, or to sink it in an unfathomable part of the sea. Unsuccessful attempts of this kind are known to have been made, and successful ones may have remained undiscovered."

Mr. Justice STORY, in *United States* v. *Gilbert,* 2 Sumn. 19 (Fed. Cas. No. 15,204), in speaking of the rule that there ought to be no conviction for murder unless the murdered body is found, says that it "certainly cannot be admitted as correct in point of common reason or of law, unless courts of justice are to establish a positive rule to screen persons from punishment who may be guilty of the most flagitious crimes." In a most copious and extensive note to *State* v. *Williams* (N. C.), 78 Am. Dec. 253, it is said by the learned editors of that work, after a reference to the rule that direct and positive evidence is not necessary to prove the corpus delicti, and the authorities in support thereof, that: "This rule is now clearly established, and it would be most unreasonable to always require direct and positive evidence. Crimes, especially those of the worst kind, are naturally committed at chosen times, in darkness and secrecy. Human tribunals must therefore act upon such indications as the circumstances of the case present or admit, or society must be broken up. The cases just cited show that the jury may find a verdict of guilty upon circumstantial evidence, and that the corpus delicti may be proved by such evidence, as well as any other part of the case, and that this rule applies in cases of murder and manslaughter, as well as in all other crimes. But a few courts have, by refined distinctions, qualified this doctrine slightly. Thus, in New York it was laid down, in the first instance by a divided bench, that in murder either the death or

the criminal agency producing it must be proved by direct evidence; then the other may be proved by circumstantial evidence: *Ruloff* v. *People,* 18 N. Y. 179. The same thing was held as to the crime of murder or manslaughter in *People* v. *Bennett,* 49 N. Y. 137, but the court was divided. The better rule, however, is that either element of the corpus delicti or both may be proved by circumstantial evidence, and this is the one sustained by the weight of authority as shown by the cases above cited. But circumstantial evidence should be acted upon with great caution, especially where the public anxiety for the detection of a great crime creates an unusual tendency to exaggerate facts and draw rash inferences *(Pitts* v. *State,* 43 Miss. 472), because of all the various sources of error one of the most copious and fatal is an unreflecting faith in human testimony." The truth of this latter statement is shown by the instances cited by Mr. Justice MASON in his opinion in *People* v. *Ruloff,* 3 Parker, Cr. R. 401.

To the doctrine of these cases and the rule thus stated we give our assent. The strict rule contended for by defendant would operate completely to shield a criminal from punishment for the most atrocious crime, and afford him absolute immunity if he were cunning enough to consume or destroy the body of his victim by fire or some chemical agency, or completely hide it away or otherwise destroy its identity, although the proof of his guilt might be of the most clear and convincing kind, and remove all possible doubt in the premises. The death of the person alleged to have been killed is a distinct ingredient in the case of the prosecution for murder or manslaughter, and must be established by direct testimony or presumptive evidence of the most cogent and irresistible kind. Great care in such a case should always be observed in acting upon presumptive or circumstantial evidence. No conviction should be had or allowed to stand on mere suspicion or conjecture alone. Whether the law will in any case permit a conviction for murder where no supposed remains or part of the remains of the person alleged to have been murdered have been found and there is no evidence of the body having been consumed by fire, chemicals, or the like, is not necessary for us to consider at this time. Where, as here,

the entire circumstances point with one accord to the death of the person alleged to have been murdered, the finding of fragments of a human body or of metallic articles which are positively identified as part of the body of the alleged victim, or as articles worn by him, will be sufficient, if believed by the jury, to establish the fact of death, when this is the best evidence that can be obtained under the circumstances: *People* v. *Alviso,* 55 Cal. 230; *McCulloch* v. *State,* 48 Ind. 109; *Commonwealth* v. *Webster,* 5 Cush. 295 (52 Am. Dec. 711); *State* v. *Williams,* 52 N. C. 446 (78 Am. Dec. 248); *Gray* v. *Commonwealth,* 101 Pa. 380 (47 Am. Rep. 733). No universal and unvariable rule can be laid down in regard to the proof of the corpus delicti. Each case depends upon its own peculiar circumstances. The body of the crime may be proved by the best evidence which is capable of being adduced, if it is sufficient for the purpose. Such an amount of accompanying or relative facts, whether direct or circumstantial, must be produced as establish the fact beyond a moral certainty, and to the exclusion of every other reasonable hypothesis. There was sufficient evidence, without commenting upon it, in the case at bar, in our opinion, to establish the death of the alleged victim within the rules of law referred to.

AFFIRMED.

Decided 27 March, rehearing denied 3 July, 1905.